**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| and | |
| COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | |
| Plaintiffs, | Civil Action No. |
| v. | |
| CAPITAL REGION WATER, | |
| and | |
| THE CITY OF HARRISBURG, PA, | |
| Defendants. | |

<u>**COMPLAINT**</u>

The United States of America, by authority of the Attorney General of the United States, and through the undersigned attorneys on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the Commonwealth of Pennsylvania Department of Environmental Protection ("PADEP"), file this Complaint, and allege as follows:

**NATURE OF ACTION**

1.    This is a civil action for injunctive relief and civil penalties brought against Capital Region Water and the City of Harrisburg, Pennsylvania, (collectively, "Defendants") pursuant to Sections 309(b) and (d) of the Federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1319 (b) and (d), for permanent injunctive relief and assessment of civil penalties regarding the operation of a wastewater treatment plant, combined sewage (raw sewage, stormwater, and other wastewater)

1

collection and conveyance system, and separate stormwater system. The United States alleges that Defendants discharged, and that Capital Region Water continues to discharge, pollutants into the waters of the United States in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), from at least 59 constructed combined sewer outfalls; that Defendants violated conditions established in the National Pollutant Discharge Elimination System ("NPDES") permits issued to Capital Region Water by PADEP, as authorized by EPA under Section 402(b) of the CWA, 33 U.S.C. § 1342(b); that the City of Harrisburg has violated conditions established in the NPDES General Permit for Discharges from Small Municipal Separate Storm Sewer Systems ("MS4") under which it had coverage, and that Capital Region Water continues to violate the CWA by operating the subsurface MS4 without a permit.

2.     PADEP is the agency within the Commonwealth of Pennsylvania (the "Commonwealth") that is charged with the duty and authority to administer and enforce, *inter alia*, the Clean Streams Law of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-691.1001. PADEP is a "state water pollution control agency" and "person" as defined in Section 502(1) and (5) of the CWA, 33 U.S.C. § 1362(1) and (5). PADEP has authority to join this Complaint pursuant to Section 601 of the Clean Streams Law, 35 P.S. § 691.601. PADEP alleges that the City of Harrisburg and Capital Region Water discharged and/or continue to discharge pollutants, including sewage, into waters of the Commonwealth in violation of Sections 201, 202, and 401 of the Clean Streams Law, 35 P.S. §§ 691.201, 691.202, and 691.401, and the rules and regulations promulgated thereunder.

## JURISDICTION, VENUE, NOTICE AND AUTHORITY

3.     This Court has jurisdiction over the subject matter of this action pursuant to Sections

309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and 28 U.S.C. §§ 1331, 1345, and 1355.

4.    This Court has supplemental jurisdiction over the PADEP Commonwealth law claims alleged herein pursuant to 28 U.S.C. § 1367(a) because the Commonwealth claims are so related to the federal claims as to form part of the same case or controversy.

5.    Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and Section 309(b) of the CWA, 33 U.S.C. § 1319(b), because it is the judicial district where Defendants are located, where a substantial part of the events or omissions giving rise to the claims occurred, and where the alleged violations occurred.

6.    Authority to bring this action is vested in the Attorney General of the United States under Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

## DEFENDANTS

7.    Defendant, Capital Region Water ("CRW"), formerly The Harrisburg Authority, is a municipal authority created in 1957 under the Pennsylvania Municipal Authorities Act, 53 Pa. C.S.A. §§ 5601-23, and is located in Dauphin County, at 212 Locust Street, Suite 302, Harrisburg, PA 17101.

8.    CRW has the power to sue and be sued.  53 Pa. C.S.A. § 5607(d)(2).

9.    CRW is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5) and Section 1 of the Clean Streams Law, 35 P.S. § 691.1, and a "municipality" within the meaning of Section 502(4) of the CWA, 33 U.S.C. § 1362(4).

10.    Defendant, the City of Harrisburg ("Harrisburg"), is a municipality located in the Commonwealth of Pennsylvania.

11.    Harrisburg is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. §

1362(5) and Section 1 of the Clean Streams Law, 35 P.S. § 691.1, and a "municipality" within the meaning of Section 502(4) of the CWA, 33 U.S.C. § 1362(4).

## FEDERAL STATUTORY BACKGROUND

12.     The purpose of the CWA is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes a national goal to eliminate the discharge of pollutants into navigable waters.  33 U.S.C. § 1251(a)(1).

13.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except as authorized by a NPDES permit issued by EPA or an authorized State pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

14.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

15.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" to be "the waters of the United States, including the territorial seas."

16.     Federal regulations promulgated pursuant to the CWA define the phrase "waters of the United States" to include, in relevant part, (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) all interstate waters; (iii) tributaries of these waters; and (iv) wetlands adjacent to the foregoing.  40 C.F.R. § 122.2.

17.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines the term "point source" as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit…from which pollutants are or may be discharged."

18.     Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that the Administrator of the

EPA may issue NPDES permits to authorize the discharge of pollutants into waters of the United States, subject to the conditions and limitations set forth in such permits.

19. Section 402(b) of the CWA, 33 U.S.C. § 1342(b), provides that a state may establish its own permit program, and after receiving EPA's authorization of its program, may issue NPDES permits within its jurisdiction.

20. EPA retains concurrent enforcement authority pursuant to Section 402(i) of the CWA, 33 U.S.C. § 1342(i).

21. Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the Administrator of EPA to commence a civil action to obtain appropriate relief, including a permanent or temporary injunction, when any person: discharges without a permit in violation of Section 301 of the CWA, 33 U.S.C. § 1311, or violates any permit condition or limitation in a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

22. The United States Department of Justice has authority to bring this action on behalf of EPA pursuant to Section 506 of the CWA, 33 U.S.C. § 1366.

23. Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the court may impose civil penalties up to $25,000 per day for each violation occurring prior to January 31, 1997. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Pub. L. 101-410, enacted October 5, 1990; 104 Stat. 890), as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134, enacted April 26, 1996; 110 Stat. 1321), EPA may seek civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and up to $32,500 per day per violation on or after March 15, 2004, and up to $37,500 per day per violation on or after January 12, 2009 (See 73 Fed. Reg. 75340, 75345) (Dec. 11, 2008) pursuant to 40 C.F.R. Part 19.

## Regulation of Sewage Overflows

24.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), includes "sewage" in the definition of the term "pollutant."

25.     Section 402(q) of the CWA, 33 U.S.C. § 1342(q), provides that each permit, order, or decree issued after December 21, 2000, for discharges from a municipal combined sewer system shall conform to EPA's Combined Sewer Overflow Control Policy ("CSO Policy"), 59 Fed. Reg. 18688 (May 19, 1994).

26.     The CSO Policy requires permittees with CSOs to implement the nine minimum controls ("NMCs"), which are technology-based actions designed to reduce CSOs and their effects on receiving water quality.  The CSO policy also requires permittees to develop long-term control plans ("LTCPs") for controlling CSOs, designed to achieve compliance with state water quality standards.

27.     At all times relevant to this Complaint, the Commonwealth of Pennsylvania has been authorized by EPA, pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), to administer a NPDES permit program for regulating the discharges of pollutants into navigable waters within the Commonwealth's jurisdiction.  EPA authorized PADEP to administer a NPDES permit program on July 1, 1978.

## Regulation of Storm Water

28.     Federal regulations promulgated pursuant to the CWA define the term "storm water" as "storm water runoff, snow melt runoff and surface runoff and drainage."  40 C.F.R. § 122.26(b)(13).

29.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p), sets forth the requirements for the discharge of storm water, including discharges of storm water from MS4s.

30.     40 C.F.R. § 122.26(b)(8), defines an MS4 as "a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains): (i) [o]wned or operated by a city, town borough, county, parish, district, association, or other public body (created by State law)…that discharges to waters of the United States; (ii) [d]esigned or used for collecting or conveying storm water; (iii) [w]hich is not a combined sewer; and (iv) [w]hich is not part of a Publicly Owned Treatment Works…."

31.     EPA promulgated regulations at 40 C.F.R. § 122.30-37 (64 Fed. Reg. 68722) to address storm water discharges from small MS4s.  40 C.F.R. § 122.26(b)(16) defines a "small municipal separate storm sewer system," in part, as "all separate storm sewers that are: owned or operated by…[a] city…having jurisdiction over disposal of sewage, industrial wastes, storm water…not defined as 'large' or 'medium' municipal separate storm sewer systems pursuant to paragraphs (b)(4) and (b)(7) of this section, or designated under paragraph (a)(1)(v) of this section."

32.     Pursuant to 40 C.F.R. § 122.32(a)(1), all small MS4s located in an "urbanized area" (as determined by the latest Decennial Census by the Bureau of Census) are regulated small MS4s. 40 C.F.R. § 122.33(a) and (b) require operators of regulated small MS4s to seek authorization to discharge under the applicable NPDES general permit issued by the permitting authority, by submitting a Notice of Intent ("NOI") for coverage under such permit.

33.     EPA may issue general permits covering one or more categories of storm water discharges.  40 C.F.R. § 122.28.  Pursuant to 40 C.F.R. § 123.25, authorized state permitting programs may include provisions for general permits as well.

34.     At all times relevant to this Complaint, the Commonwealth of Pennsylvania has been authorized by EPA to issue NPDES general permits.  EPA authorized PADEP to issue NPDES general permits on August 2, 1991.

## PENNSYLVANIA STATUTORY BACKGROUND

35.     Sections 201 and 202 of the Clean Streams Law, 35 P.S. §§ 691.201 and 691.202, prohibit the discharge of sewage by any person or municipality into any waters of the Commonwealth except in compliance with a permit issued under Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

36.     Section 92a.9 of the regulations adopted by the Pennsylvania Environmental Quality Board, 25 Pa. Code § 92a.9, provides that a NPDES Permit satisfies the permit requirement of Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

37.     Section 601 of the Clean Streams Law, 35 P.S. § 691.601, provides in pertinent part:

> Any activity or condition declared by this act to be a nuisance or which is otherwise in violation of this act shall be abatable in the manner provided by law or equity for the abatement of public nuisances.

38.     Section 611 of the Pennsylvania Clean Streams Law, 35 P.S. § 691.611, provides in pertinent part:

> It shall be unlawful to fail to comply with any rule or regulation of the department or to fail to comply with any order or permit or licenses of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or licenses of the department, to cause air or water pollution, or to hinder, obstruct, prevent or interfere with the department or its personnel in the performance of any duty hereunder or to violate the provisions of 18 Pa. C.S. Section 4903 (relating to false swearing) or 4904 (relating to unsworn falsifications to authorities).  Any person or municipality engaging in such conduct shall be subject to the provisions of Sections 601, 602, and 605.

39.     Section 605 of the Pennsylvania Clean Streams Law, 35 P.S. § 691.605, provides in pertinent part:

> In addition to proceeding under any other remedy available at law or equity for a violation of provision of this act, rule, regulations, order of the department, or condition of any permit issued pursuant to this act, the department, after hearing, may assess a civil penalty upon a person or municipality for such violation. Such a penalty may be assessed whether or not the violation was willful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) per day for each violation.

40.     Pursuant to Section 605 of the Clean Streams Law, 35 P.S. § 691.605, the court may impose civil penalties up to $10,000 per day for each violation.

## GENERAL ALLEGATIONS

41.     Approximately 90% of the sewer system for Harrisburg is a "combined" sewer system, meaning that both storm water runoff and sanitary and industrial wastewater are collected and transported together through the same conveyances. The remaining approximately 10% of the sewer system for Harrisburg is a "separate" sewer system, meaning that it collects and transports sanitary sewage and storm water in separate conveyances ("Separate Sanitary Sewer System").

42.     CRW owns a "treatment works" as that term is defined in Section 212(2) of the CWA, 33 U.S.C. § 1292(2), and a "publicly owned treatment works" ("POTW") as that term is defined in EPA regulations implementing the CWA, 40 C.F.R. § 122.2 (cross-referencing the definition at 40 C.F.R. § 403.3(q)).

43.     At all times relevant herein, CRW has owned a wastewater treatment facility and an associated conveyance system, including combined sewage and storm water conveyances which receive wastewater and storm water runoff from residential, commercial, industrial and combined sewage sources. This conveyance system includes pump stations, interceptor sewers, force main, and combined sewer outfalls (collectively, the "Conveyance System").

44.     The Capital Region Water Advanced Wastewater Treatment Facility ("AWTF"), located at 1662 South Cameron Street, Harrisburg, PA, 17104, is the POTW that serves the City of Harrisburg and several surrounding satellite communities, including Paxtang Borough, Penbrook

Borough, Steelton Borough, Susquehanna Township, Lower Paxton Township and Swatara Township, for a total service population of approximately 122,000.

45.    At all times relevant herein prior to December 4, 2013, Harrisburg owned and operated the collection system, which consists of sewers, manholes, and other associated appurtenances (collectively, the "Collection System").

46.    At all times relevant herein prior to November 4, 2013, Harrisburg was the operator of the AWTF and the Conveyance System, and responsible for both operation and maintenance of the AWTF and Conveyance System pursuant to the terms of a 1976 lease agreement with CRW, most recently supplemented in 2009. That lease agreement was terminated by agreement of Defendants, effective December 4, 2013.

47.    Harrisburg and CRW negotiated a transition agreement effective November 4, 2013 ("Transition Agreement"), resulting in CRW acquiring operational and maintenance responsibilities for the Conveyance System and AWTF, and an asset transfer agreement effective December 4, 2013 ("Transfer Agreement"), resulting in CRW acquiring ownership, operation, and maintenance responsibilities for the Collection System.

48.    At all times relevant herein, commencing on December 4, 2013, CRW assumed specified obligations and liabilities, as well as ownership, operation, and sole responsibility for maintaining the AWTF, the Conveyance System, and the Collection System (collectively, the "Combined Sewer System"), pursuant to the Transfer Agreement.

49.    The effluent discharge limitations for Outfall 001 at the AWTF contained in the NPDES Permits have been calculated based on a capacity to treat at least 37.7 million gallons of wastewater per day at the AWTF.

50.    During certain rainfall events, the volume of wastewater entering the

Combined Sewer System exceeds the hydraulic capacity of the sewers and/or the treatment facility. In those circumstances, the Conveyance and Collection Systems will discharge untreated combined sewage from certain designated outfalls, known as combined sewer outfalls.

51. When combined sewage discharges from a combined sewer outfall into a receiving water body, the event is known as a combined sewer overflow ("CSO").

52. The combined sewer outfalls from which Defendants discharged and CRW currently discharges are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

53. Pursuant to the CSO Policy, 59 Fed. Reg. 18689, CSOs are point sources subject to NPDES permit requirements, including both technology-based and water quality-based requirements of the CWA.

54. The combined sewage that Defendants discharged and CRW currently discharges from the combined sewer outfalls contains raw sewage and storm water runoff.

55. The combined sewer outfalls in Harrisburg, and Outfall 001 at the AWTF, discharge to the Susquehanna River or Paxton Creek. The Susquehanna River is a "water of the United States" within the meanings of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and the federal regulations implementing the CWA at 40 C.F.R. § 122.2. Paxton Creek is a perennial tributary of the Susquehanna River.

56. Prior to December 3, 2013, Harrisburg was the owner and operator of a Small Municipal Separate Storm Sewer System (referred to herein as the "MS4") which is a system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, and storm drains) designed to collect, convey, and directly discharge storm water to receiving waters.

57.     The MS4 is a small MS4, as defined in 40 C.F.R. § 122.26(b)(16), and a regulated small MS4 pursuant to 40 C.F.R. § 122.32(a)(1).

58.     The MS4 outfalls discharge to the Susquehanna River, Paxton Creek, or Spring Creek. Spring Creek is a perennial tributary of the Susquehanna River.

59.     Pursuant to the Transfer Agreement, effective December 4, 2013, CRW acquired full ownership and operational responsibility for the subsurface MS4. Consequently, CRW currently owns, operates, and has the sole responsibility for maintaining the subsurface MS4.

## PERMITS

60.     On January 22, 2003, pursuant to Section 402(a) of the Clean Water Act, 33 U.S.C. § 1342(a) and Section 202 of the Clean Streams Law, 35 P.S. § 691.202, PADEP issued NPDES Permit No. PA 0027197 to CRW ("2003 NPDES Permit"). That permit authorized CRW to operate the AWTF and to discharge from Outfall 001 at that facility to Paxton Creek and the Susquehanna River in accordance with the requirements and conditions of the permit. The 2003 NPDES Permit was effective January 22, 2003 to February 1, 2008.

61.     The 2003 NPDES Permit also identified and authorized discharges from 60 combined sewer outfalls to Paxton Creek and the Susquehanna River in accordance with the requirements and conditions of the permit.

62.     On October 5, 2004, PADEP issued an amendment to the 2003 NPDES Permit extending the compliance due date to complete selection of the recommended alternative for the LTCP from September 1, 2004 to September 1, 2005.

63.     On March 3, 2006, PADEP issued another amendment to the 2003 NPDES Permit, effective April 1, 2006, to incorporate the Chesapeake Bay monitoring requirements for total nitrogen and total phosphorous.

64.     On June 30, 2008, PADEP reissued NPDES Permit No. PA 0027197 to CRW.  This permit was subsequently revoked and reissued on December 4, 2009 ("2010 NPDES Permit") to make certain milestone dates fall within the permit cycle.  That permit also authorized CRW to operate the AWTF and to discharge from Outfall 001 at that facility to Paxton Creek and the Susquehanna River in accordance with the requirements and conditions of the permit.  The 2010 NPDES Permit is effective from January 1, 2010 to December 31, 2014.

65.     The 2010 NPDES Permit also identifies and authorizes discharges from 59 combined sewer outfalls to Paxton Creek and the Susquehanna River in accordance with the requirements and conditions of the permit.

66.     At all times relevant herein, CRW's NPDES Permits have authorized the discharge of pollutants only from specified point sources (identified in the permit as one or more numbered "outfalls") to specified waters of the United States and/or the Commonwealth, subject to limitations and conditions set forth in the NPDES Permits.

67.     On March 9, 2003, PADEP issued the General NPDES Permit for Stormwater Discharges from Small Municipal Separate Storm Sewer Systems, PAG-133686 ("MS4 Permit").  The MS4 Permit, originally scheduled to expire on March 8, 2008, was administratively extended several times, most recently until March 15, 2013 (41 Pa. Bulletin 5041 (Sept. 17, 2011)).

68.     On March 6, 2003, Harrisburg submitted a Notice of Intent ("NOI") for coverage under the MS4 Permit, electing to implement the approved stormwater management program entirely under the PADEP Stormwater Management Protocol ("Stormwater Protocol").

## FIRST CLAIM FOR RELIEF
### (Prohibited Dry Weather Overflows into Waters of the United States and the Commonwealth of Pennsylvania)

69.     The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

70.     Part A.I.C. of the 2003 NPDES Permit and Part A.I.D. of the 2010 NPDES Permit authorize CRW to discharge combined sewage from the combined sewer outfalls identified in the Permits only when "necessitated by storm water entering the sewer system and exceeding the hydraulic capacity of the sewers and/or the treatment plant."

71.     The 2003 NPDES Permit and the 2010 NPDES Permit state that dry weather overflows (overflows that occur without an accompanying precipitation event or snowmelt) are prohibited.

72.     On over 59 occasions between at least August 2007 to December 2013, and continuing to December 4, 2013 for Harrisburg and to the present for CRW, Defendants have discharged combined sewage from combined sewer outfalls during dry weather, resulting in over approximately 8.3 million gallons of untreated combined sewage entering the Susquehanna River and Paxton Creek.

73.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Sections 201 and 202 of the Clean Streams Law, 35 P.S. §§ 691.201 and 691.202, prohibit the discharge of any pollutant by any person except as authorized by a NPDES permit issued by EPA or an authorized State pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

74.     Each day of each of the discharges from designated CSO outfalls that violated the terms and conditions of Part C.III of the 2003 NPDES Permit and Part C.V of the 2010 NPDES Permit constitutes a separate violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

75. Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), any person who violates any condition which implements Section 301 of the CWA, including permit conditions and limitations, shall be subject to injunctive relief and a civil penalty. Defendants are subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004, and $37,500 per day for each violation of the CWA occurring on or after January 12, 2009. Defendants are also subject to injunctive relief under the Clean Streams Law, 35 P.S. §§ 691.3, 691.601, and 691.611, and civil penalties of up to $10,000 per day per violation, 35 P.S. § 691.605.

76. Unless enjoined by an order of the Court, CRW will continue to discharge pollutants from the combined sewer outfalls in violation of the NPDES Permit, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

### SECOND CLAIM FOR RELIEF
### (Effluent Limitation Violations – Outfall 001)

77. The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

78. The NPDES Permit authorizes CRW to discharge pollutants from a single point at the AWTF ("Outfall 001") as specified in Part A, Section I.A. of the 2003 and 2010 NPDES Permits. Discharges from Outfall 001 are subject to effluent limitations that prohibit discharges of specified pollutants in excess of numeric monthly and weekly average mass unit limits, as well as numeric monthly and weekly average concentration limits.

79. On numerous occasions from at least May 2007 to December 3, 2013 for Harrisburg, and to the present for CRW, Defendants discharged wastewater containing pollutants from Outfall 001 in violation of the effluent limitations contained in the 2003 and 2010 NPDES Permits.

80.     Defendants submitted discharge monitoring reports ("DMRs") to report the effluent limit violations from Outfall 001, and certified to the accuracy of the information reported in the DMRs.

81.     Appendix A, incorporated herein by reference, provides a table of currently known occasions on which Defendants discharged pollutants from the AWTF at concentrations that violated the NPDES Permits.

82.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except as authorized by a NPDES permit issued by EPA or an authorized State pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. Section 202 of the Clean Streams Law, 35 P.S. § 691.202, prohibits the discharge of sewage by any person except as authorized by a permit.

83.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), any person who violates any condition or limitation which implements Section 301 of the CWA, including permit conditions and limitations, shall be subject to injunctive relief and a civil penalty. Defendants are subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004, and $37,500 per day for each violation of the CWA occurring on or after January 12, 2009. Defendants are also subject to injunctive relief under the Clean Streams Law, 35 P.S. §§ 691.3, 691.601, 691.611, and civil penalties of up to $10,000 per day per violation, 35 P.S. § 691.605. Each day Defendants discharge wastewater containing pollutants from Outfall 001 in violation of the effluent limits contained in the NPDES Permits constitutes a separate violation of a permit condition or limitation and each discharge is a separate violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

84. Unless enjoined by an order of the Court, CRW will continue to discharge pollutants in excess of permit limits in violation of the NPDES Permits and Section 301(a) of the CWA, 33 U.S.C. § 1311(a) and Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

**THIRD CLAIM FOR RELIEF**
**(Failure to Implement Nine Minimum Controls)**

85. The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

86. EPA's CSO Policy requires permittees with CSOs to fully implement the Nine Minimum Control ("NMC") measures for CSOs by January 1, 1997.

87. The NMCs are best management practices that serve as technology-based effluent limits in permits that authorize discharges from CSOs.

88. The NMCs include:

   a) (#1) Proper operation and regular maintenance programs for the sewer system and CSO outfalls;

   b) (#2) Maximum use of the collection system for storage;

   c) (#3) Review and modification of pretreatment requirements to ensure that CSO impacts are minimized;

   d) (#4) Maximization of flow to the POTW for treatment;

   e) (#5) Elimination of CSOs during dry weather;

   f) (#6) Control of solid and floatable materials in CSOs;

   g) (#7) Pollution prevention programs to reduce contaminants in CSOs;

   h) (#8) Public notification to ensure that the public receives adequate notification of CSO occurrences and CSO impacts; and

i) (#9) Monitoring to effectively characterize CSO impacts and the efficacy of CSO controls.

89. Part C.III. of the 2003 NPDES Permit, and Part C.V. of the 2010 NPDES Permit state that "CSOs are point source discharges that must be provided with control measures in accordance with the Federal Clean Water Act and the 1994 National CSO Policy."

90. Part C.III.A. of the 2003 NPDES Permit, and Part C.V.A. of the 2010 NPDES Permit require that the "permittee shall continue implementation of the Nine Minimum Controls (NMCs), [and] demonstrate systemwide compliance with the NMCs," and that "[PADEP] will use the EPA guidance document entitled 'Guidance for Nine Minimum Controls' (EPA 832-B – 95-003), dated May 1995, and specific comments provided during review of the NMCs documentation reports to determine continued compliance with the CSO permit requirements."

91. From at least March 2010 to December 4, 2013 for Harrisburg, and continuing to the present for CRW, Defendants have violated permit conditions relating to the NMCs as follows:

**A. Failure to Have Proper Operation and Regular Maintenance Programs for the Sewer System and CSOs**

92. Defendants are in violation of the requirement to have proper operation and regular maintenance programs for the sewer system and CSOs (NMC #1) for reasons including, but not limited to, the following:

a) Upon information and belief, Defendants have failed and CRW continues to fail to appropriately review and modify the CSO Operations Manual;

b) Defendants lack a list of facilities critical to performance of the combined sewer system and AWTF;

c) Defendants lack written standard operating procedures ("SOPs") or a schedule for conducting regular cleaning and preventative maintenance in the Collection System.

**B. Failure to Maximize Use of the Collection System for Storage**

93. Defendants are in violation of the requirement to maximize use of the collection system for storage (NMC #2) for reasons including, but not limited to, the following:

a) Defendants have failed and CRW continues to fail to appropriately adjust weir heights in the combined sewer system to maximize storage and in response to changes in wastewater flows in the service area;

b) Defendants have failed and CRW continues to fail to prevent the inflow of river water into the combined sewer system, limiting the use of the Collection and Conveyance Systems for storage of combined sewage;

c) Defendants have failed and CRW continues to fail to take adequate steps to control the accumulation of debris, grit, and sediment in the combined sewer system, limiting the use of the system for storage of combined sewage.

**C. Failure to Maximize Flow to the POTW for Treatment**

94. Defendants are in violation of the requirement to maximize flow to the POTW for treatment (NMC #4) for reasons including, but not limited to, the following:

a) Defendants have failed and CRW continues to fail to appropriately adjust weir heights to maximize flow to the AWTF for treatment;

b) Defendants have failed and CRW continues to fail to prevent inflow of river water into the combined sewer system, limiting the ability to maximize flow of combined sewage to the AWTF for treatment;

c) Defendants have failed and CRW continues to fail to take adequate steps to control the accumulation of debris, grit, and sediment which reduces the capacity of the system and limits the ability to maximize flow to the AWTF for treatment.

**D. Failure to Eliminate CSOs During Dry Weather**

95. Defendants are in violation of the requirement to eliminate CSOs during dry weather (NMC #5) for reasons including, but not limited to Defendants' failure and CRW's continued failure to eliminate discharges of wastewater from CSO outfalls during dry weather, not as a result of precipitation.

**F. Failure to Control Solid and Floatable Materials in CSOs**

96. Defendants are in violation of the requirement to control solid and floatable materials in CSOs (NMC #6) for reasons including, but not limited to, the following:

a) Defendants have failed and CRW continues to fail to install solid and floatable controls at the majority of the permitted combined sewer outfall locations;

b) Defendants have failed and CRW continues to fail to implement a routine schedule for cleaning accumulated debris and sediment from catch basins in the system.

**G. Failure to Notify Public to Ensure Adequate Notification of CSO Occurrences and Impacts**

97. Defendants are in violation of the requirement to notify the public to ensure adequate notification of CSO occurrences and impacts (NMC #8) for reasons including, but not limited to, the following:

a) Some signs posted by Defendants to mark the location of combined sewer outfalls are inadequate in size and information displayed, and are not visible from the water in some locations;

b) Defendants have failed and CRW continues to fail to post a sufficient number of larger CSO notification signs near permitted combined sewer outfall locations.

### H. Failure to Monitor to Effectively Characterize CSO Impacts and Efficacy of CSO Controls

98.     Defendants are in violation of the requirement to effectively characterize CSO impacts and efficacy of CSO controls (NMC #9) for reasons including, but not limited to, the following:

a) Defendants have failed and CRW continues to fail to use a method of monitoring overflows that provides accurate information regarding overflow volume;

b) Defendants have failed and CRW continues to fail to report overflow volume and duration for the majority of documented combined sewer overflow events.

99.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), any person who violates any condition or limitation which implements Section 301 of the Clean Water Act, including permit conditions and limitations, shall be subject to injunctive relief and civil penalties.  Defendants are subject to injunctive relief and civil penalties up to $32,500 per day for each violation occurring on or after March 15, 2004, and $37,500 per day for each violation of the CWA occurring on or after January 12, 2009.  Defendants are also subject to injunctive relief under the Clean Streams Law, 35 P.S. §§ 691.3, 691.601, 691.611, and civil penalties up to $10,000 per day per violation, 35 P.S. § 691.605.

100.     Unless enjoined by an order of the Court, CRW will continue to violate Section 301 of the CWA, 33 U.S.C. § 1311, and Section 202 of the Clean Streams Law, 35 P.S. § 691.202, by failing to comply with the conditions of the NPDES permit regarding the nine minimum controls.

**FOURTH CLAIM FOR RELIEF**
**(Failure to Implement MS4 Minimum Control Measures)**

101.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by

reference.

102.    Part A.2 of the MS4 Permit requires that permittees, such as Harrisburg, "implement a

Stormwater Management Program that meets the following Minimum Control Measures

["MCMs"]":

    a)  (#1)  Public Education and Outreach on Stormwater Impacts

    b)  (#2)  Public Participation and Involvement

    c)  (#3)  Illicit Discharge Detection and Elimination

    d)  (#4)  Construction Site Runoff Control

    e)  (#5)  Post-Construction Stormwater Management in New Development and

        Redevelopment

    f)  (#6)  Pollution Prevention and Good Housekeeping for Municipal Operations and

        Maintenance.

103.    Pursuant to Part A.3 of the MS4 Permit, for permittees that elect to implement the

PADEP Stormwater Management Protocol ("Stormwater Protocol"), the Stormwater Protocol

"becomes part of the General Permit coverage and requirements for those permittees."  In its

Notice of Intent submitted for coverage under the MS4 Permit on March 3, 2003, Harrisburg

elected to implement all the MCMs as described in the Stormwater Protocol.

104.    Since at least July, 2010, Harrisburg violated permit conditions relating to the

MCMs as follows:

**A. Failure to Detect and Eliminate Illicit Discharges into the MS4 System**

105.     Part A.2 of the MS4 Permit and the Stormwater Protocol required Harrisburg to detect and eliminate illicit discharges into the MS4 system (MCM #3).  Harrisburg was in violation of this requirement for reasons including, but not limited to, the following:

   a)  Harrisburg failed to develop a map of the MS4 system with an internal coding system for the outfalls and has not assigned individual identifiers to its MS4 outfalls;

   b)  Harrisburg failed to develop a list of priority areas within its MS4 system for illicit discharge elimination;

   c)  Harrisburg failed to conduct inspections and dry weather field screening of MS4 outfalls in the priority areas.

**B. Failure to Implement and Enforce a Program for Post-Construction Stormwater Management in New Development and Redevelopment**

106.     Part A.2 of the MS4 Permit and the Stormwater Protocol required Harrisburg to implement and enforce a program to reduce pollution in stormwater runoff to the MS4 from new development and redevelopment projects (MCM #5).  Harrisburg was in violation of this requirement for reasons including, but not limited to, the following:

   a)  Harrisburg failed to develop a process for reviewing post-construction stormwater runoff best management practices ("BMPs");

   b)  Harrisburg failed to develop and implement a monitoring program that ensures post-construction BMPs are constructed, operated and maintained properly.

**C. Failure to Implement a Program for Pollution Prevention and Good Housekeeping for Municipal Operations and Maintenance**

107.     Part A.2 of the MS4 Permit and the Stormwater Protocol required Harrisburg to implement an operation and maintenance program that includes a training component and has the ultimate goal of preventing or reducing pollutant runoff from municipal operations (MCM #6). Harrisburg was in violation of this requirement for reasons including, but not limited to, the following:

> a)  Harrisburg failed to compile information regarding existing municipal facilities;
>
> b)  Harrisburg failed to adequately develop a municipal vehicle operations and maintenance program;
>
> c)  Harrisburg failed to conduct at least annual inspection and cleaning of catch basins;
>
> d)  Harrisburg failed to conduct basic awareness training for municipal employees regarding stormwater pollution prevention and management.

108.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), any person who violates any condition or limitation which implements Section 301 of the CWA, including permit conditions and limitations, shall be subject to injunctive relief and a civil penalty. Harrisburg is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation occurring on or after March 15, 2004, and $37,500 per day for each violation of the CWA occurring on or after January 12, 2009.  Harrisburg is also subject to injunctive relief under the Clean Streams Law, 35 P.S. §§ 691.3, 691.601, 691.611, and civil penalties up to $10,000 per day per violation, 35 P.S. § 691.605.

109.    Since December 4, 2013, CRW has owned the subsurface MS4 and operated the system without a NPDES permit, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

110.    Unless enjoined by an order of the Court, CRW will continue to violate Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

**FIFTH CLAIM FOR RELIEF**
**(Failure to Develop and Implement an Adequate Long Term Control Plan)**

111.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

112.    EPA's CSO Policy requires the submission of a "Long Term Control Plan" ("LTCP") to describe how the POTW will minimize or prevent CSOs.  CSO Policy, 59 Fed. Reg. 18691-94 (April 19, 1994).

113.    The 2010 NPDES Permit requires, *inter alia*, that CRW "continue implementation of the LTCP", and specifically to "Design Susquehanna River CSO Improvements" during the time frame "January 2012 – December 2012".

114.    CRW is in violation of this permit requirement, as it has failed to implement an LTCP in any way.

115.    CRW has failed to develop and implement an LTCP that meets the requirements of EPA's CSO Policy, and failed to comply with LTCP-related interim milestone compliance deadlines in violation of its 2010 NPDES Permit, Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

116.    Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), any person who violates any condition or limitation which implements Section 301 of the CWA, including permit conditions and limitations, shall be subject to injunctive relief and a civil penalty.  CRW

is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation of the CWA occurring on or after March 15, 2004, and $37,500 per day for each violation occurring on or after January 12, 2009. CRW is also subject to injunctive relief under the Clean Streams Law, 35 P.S. §§ 691.3, 691.601, 691.611, and civil penalties up to $10,000 per day per violation, 35 P.S. § 691.605.

117. Unless enjoined by an order of the Court, CRW will continue to violate its 2010 NPDES Permit, Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and Section 202 of the Clean Streams Law, 35 P.S. § 691.202, by failing to submit a LTCP consistent with the requirements of Section 402(q) of the Clean Water Act and EPA's CSO Policy.

## SIXTH CLAIM FOR RELIEF
### (Failure to Comply with NPDES Permit for AWTF Nutrient Upgrades)

118. The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

119. The 2010 NPDES Permit contains effluent limitations for total nitrogen and total phosphorous, along with a compliance schedule for specific actions related to the design, construction, and implementation of biological nutrient removal ("BNR") technology at the AWTF, to be taken to achieve compliance with the effluent limitations.

120. Part C.I.B. of the 2010 NPDES Permit requires that CRW meet certain enumerated deadlines pertaining to BNR upgrades at the AWTF, including:

    1) Submit WQM Part II Permit Application by August 1, 2010

    2) Award Contract for Construction by August 1, 2011

    3) Submit Quarterly Construction Progress Reports

    4) Interim Compliance with Cap Loads (Part C II.F) by September 30, 2011

5) Issue Certification of Substantial Completion (Plant Fully Operational) by May 1, 2013.

121.     CRW is in violation of these requirements, as it has failed to meet any of the deadlines required by Part C.I.B. of the 2010 NPDES Permit for the activities set forth in the preceding Paragraph.

122.     Pursuant to Sections 309(b) and (d) of the Clean Water Act, 33 U.S.C. § 1319(b) and (d), any person who violates any condition or limitation which implements Section 301 of the CWA, 33 U.S.C. § 1311, including permit conditions and limitations, shall be subject to injunctive relief and civil penalties.  CRW is subject to injunctive relief and civil penalties of up to $32,500 per day for each violation of the CWA occurring on or after March 15, 2004, and $37,500 per day for each violation occurring on or after January 12, 2009.  CRW is also subject to injunctive relief under the Clean Streams Law, 35 P.S. §§ 691.3, 691.601, 691.611, and civil penalties up to $10,000 per day per violation, 35 P.S. § 691.605.

123.     Unless enjoined by an order of the Court, CRW will continue to violate Section 301 of the Clean Water Act, 33 U.S.C. § 1311, and Section 202 of the Clean Streams Law, 35 P.S. § 691.202, by failing to comply with the conditions of the 2010 NPDES Permit regarding effluent limitations for nutrients.

### SEVENTH CLAIM FOR RELIEF
### (Prohibited Separate Sanitary Sewer Overflows)

124.     The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

125.     On at least two occasions during March 2012, Defendants discharged wastewater containing untreated sewage from various discharge points within the Separate Sanitary Sewer System which were not and are not identified in a NPDES permit as authorized discharge points,

into waters of the United States and waters of the Commonwealth. These discharges were not permitted or otherwise authorized by the Clean Water Act, the Clean Streams Law, or other federal, state, or local regulation.

126.     Each of the discharges referred to in the previous Paragraph involved a discharge of pollutants from a point source into navigable waters of the United States and waters of the Commonwealth without authorization under a NPDES Permit or other exception specified in Section 301(a) of the CWA, 33 U.S.C. § 1311(a), in violation of the CWA Section 301, 33 U.S.C. § 1311, and Sections 201 and 202 of the Clean Streams Law, 35 P.S. §§ 691.201 and 691.202.

127.     Pursuant to Sections 309(b) and (d) of the Clean Water Act, 33 U.S.C. § 1319(b) and (d), any person who violates any condition or limitation which implements Section 301 of the CWA, 33 U.S.C. § 1311, including permit conditions and limitations, shall be subject to injunctive relief and civil penalties. Defendants are subject to injunctive relief and civil penalties of up to $32,500 per day for each violation of the CWA occurring on or after March 15, 2004, and $37,500 per day for each violation occurring on or after January 12, 2009. Defendants are also subject to injunctive relief under the Clean Streams Law, 35 P.S. §§ 691.3, 691.601, 691.611, and civil penalties up to $10,000 per day per violation, 35 P.S. § 691.605.

128.     Unless enjoined by an order of the Court, CRW will continue to discharge pollutants into waters of the United States and waters of the Commonwealth in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311, and Section 202 of the Clean Streams Law, 35 P.S. § 691.202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment on their behalf against CRW and the City of Harrisburg as follows:

a) A permanent injunction directing Defendants to take all steps necessary to come into permanent and consistent compliance with the prohibition on unpermitted discharges contained in Section 301(a) of the CWA, 33 U.S.C. § 1311(a), Sections 201 and 202 of the Clean Streams Law, 35 P.S. §§ 691.201 and 691.202, and the limitations and conditions of the 2010 NDPES Permit;

b) A permanent injunction directing Defendants to take all steps necessary to achieve permanent and consistent compliance with the CWA and the regulations promulgated thereunder, and all terms and conditions of applicable NPDES and MS4 permits;

c) A judgment assessing civil penalties against Defendants for up to $32,500 per day through January 12, 2009, and up to $37,500 per day thereafter, for each violation of the CWA and/or any applicable NPDES Permit;

d) A judgment assessing civil penalties against Defendants for up to $10,000 per day for each violation of the Clean Streams Law and/or any applicable NPDES Permit.

e) Award Plaintiffs their costs and fees in this action; and

f) Grant Plaintiffs such other and further relief as the Court deems appropriate.

Respectfully submitted,

FOR THE UNITED STATES:

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


MAYA S. ABELA
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044
Phone: (202) 514-2717
Fax: (202) 616-2427
maya.abela@usdoj.gov


PETER J. SMITH
United States Attorney


D. BRIAN SIMPSON
OH Bar # 71431
Assistant United States Attorney
Middle District of Pennsylvania
228 Walnut Street, Suite 220
Harrisburg, PA 17108-1754
Phone: (717) 221-4482
Fax: (717) 221-2246
D.Brian.Simpson@usdoj.gov


*Of Counsel*:

DEANE H. BARTLETT
Senior Assistant Regional Counsel
U.S. EPA Region III

1650 Arch Street
Philadelphia, PA  19103-2029

JOANNA CITRON DAY
Attorney Advisor
U.S. EPA
1200 Pennsylvania Ave., NW
Washington, DC  20460

FOR THE COMMONWEALTH OF
PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION:


MARTIN H. SOKOLOW
Senior Counsel for Special Projects
Office of Chief Counsel
Department of Environmental Protection
South Central Regional Office
909 Elmerton Avenue
Harrisburg, PA 17110-8200
Phone: (717) 787-8790
Fax: (717) 772-2400
msokolow@pa.gov

**APPENDIX A:**
**EFFLUENT LIMITATION VIOLATIONS**

| Reporting Period | Parameter | Concentration/Loading | Required | Reported |
|---|---|---|---|---|
| May 2007 | Nitrogen, ammonia | Average Monthly | 17 mg/l | 23 mg/l |
| June 2007 | Nitrogen, ammonia | Average Monthly | 17 mg/l | 22 mg/l |
| July 2007 | Nitrogen, ammonia | Average Monthly | 17 mg/l | 19.3 mg/l |
| September 2007 | Nitrogen, ammonia | Average Monthly | 17 mg/l | 21.7 mg/l |
| October 2007 | Nitrogen, ammonia | Average Monthly | 17 mg/l | 18.5 mg/l |
| August 2008 | Nitrogen, ammonia | Average Monthly | 17 mg/l | 20 mg/l |
| October 2008 | Nitrogen, ammonia | Average Monthly | 17 mg/l | 21 mg/l |
| January 2011 | Total Suspended Solids | Average Monthly | 30 mg/l | 41 mg/l |
| February 2011 | Total Suspended Solids | Average Monthly | 30 mg/l | 54 mg/l |
| | | Average Weekly | 45 mg/l | 68 mg/l [4 weeks] |
| | | Average Monthly | 9,433 lb/day | 10,468 lb/day |
| March 2011 | Total Suspended Solids | Average Monthly | 30 mg/l | 40 mg/l |
| | | Average Weekly | 45 mg/l | 53 mg/l [2 weeks] |
| | | Average Monthly | 9,433 lb/day | 11,996 lb/day |
| | | Average Weekly | 14,149 lb/day | 17,243 lb/day |
| September 2011 | Total Suspended Solids | Average Weekly | 14,149 lb/day | 15,391 lb/day |
| June 2013 | Nitrogen, ammonia | Average Monthly | 11 mg/l | 13 mg/l |
| August 2013 | Nitrogen, ammonia | Average Monthly | 11 mg/l | 12 mg/l |
| September 2013 | Nitrogen, ammonia | Average Monthly | 11 mg/l | 13 mg/l |
| June 2014 | Nitrogen, ammonia | Average Monthly | 11 mg/l | 12 mg/l |
| July 2014 | Nitrogen, ammonia | Average Monthly | 11 mg/l | 15 mg/l |