| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> and <br><br> COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION <br><br>     Plaintiffs, <br><br>     v. <br><br> CAPITAL REGION WATER <br><br> and <br><br> THE CITY OF HARRISBURG, PA, <br><br>     Defendants. | Civil Action No. 1:15-cv-00291-WWC |

## **PARTIAL CONSENT DECREE**

# TABLE OF CONTENTS

I. JURISDICTION AND VENUE .......................................................................5

II. PARTIES BOUND ...................................................................................6

III. PURPOSE .........................................................................................7

IV. DEFINITIONS .....................................................................................8

V. COMPLIANCE MEASURES ...............................................................................16

    A. PERMANENT INJUNCTION ...........................................................................16

    B. LEGAL AUTHORITY ................................................................................16

    C. NINE MINIMUM CONTROLS ..........................................................................17

    D. MINIMUM CONTROL MEASURES – STORMWATER DISCHARGES ..........29

    E. LONG TERM CONTROL PLAN .........................................................................29

    F. SEPARATE SANITARY SEWER COMPLIANCE................................................41

    G. ONGOING CONSTRUCTION / EARLY ACTION PROJECTS .........................45

    H. GENERAL COMPLIANCE.............................................................................47

VI. REVIEW AND APPROVAL OF DELIVERABLES .......................................................50

VII. REPORTING REQUIREMENTS .........................................................................53

    A. REPORTS ........................................................................................53

    B. CERTIFICATION AND ADMISSIBILITY .............................................................56

VIII. FUNDING .......................................................................................57

IX. CIVIL PENALTIES ................................................................................57

X. STIPULATED PENALTIES ............................................................................57

XI. FORCE MAJEURE ..................................................................................64

XII. DISPUTE RESOLUTION .............................................................................67

XIII. EFFECT OF SETTLEMENT ..........................................................................69

XIV. NOT A PERMIT ...................................................................................71

XV.    INFORMATION COLLECTION AND RETENTION ....................................................72

XVI.   NOTICES AND SUBMISSIONS ......................................................................................75

XVII.  EFFECTIVE DATE............................................................................................................76

XVIII. RETENTION OF JURISDICTION....................................................................................77

XIX.   MODIFICATION ...............................................................................................................77

XX.    TERMINATION..................................................................................................................77

XXI.   PUBLIC PARTICIPATION ...............................................................................................79

XXII.  SIGNATORIES/SERVICE.................................................................................................79

XXIII. COSTS OF SUIT ...............................................................................................................79

XXIV. INTEGRATION/APPENDICES ........................................................................................80

XXV.  FINAL JUDGMENT ..........................................................................................................80

WHEREAS, Plaintiff, the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiff Commonwealth of Pennsylvania Department of Environmental Protection ("PADEP"), jointly filed a Complaint in this matter against Defendants Capital Region Water, ("CRW") and the City of Harrisburg, Pennsylvania ("City") (collectively, "Defendants") seeking injunctive relief and civil penalties, and alleging, *inter alia*, that CRW and the City violated and CRW continues to violate the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, and certain terms and conditions of the National Pollutant Discharge Elimination System permit No. PA 0027197 ("NPDES Permit") issued to CRW and relating to the municipal wastewater treatment plant and the conveyance system owned by CRW and formerly operated by the City, and the collection system formerly owned and operated by the City. The Complaint further alleges that the City violated the CWA and certain terms and conditions of the National Pollutant Discharge Elimination System permit No. PAG-13, coverage No. PAG-133686, for the municipal separate storm sewer system ("MS4 General Permit");

WHEREAS, CRW, formerly known as The Harrisburg Authority, is a municipal authority organized under the Municipal Authorities Act, as amended, 53 Pa. Cons. Stat. Ann. §§ 5601-5623, that owns a publicly owned treatment works ("POTW") which includes a treatment plant known as the Capital Region Water Advanced Wastewater Treatment Facility ("AWTF") and a conveyance system ("Conveyance System") which includes interceptors and pump stations that convey wastewater from the collection system to the AWTF.

WHEREAS, at all times relevant herein prior to November 4, 2013, the City operated and maintained the AWTF and the Conveyance System.

WHEREAS, the City and CRW entered into an agreement to transition operation and maintenance of the AWTF and the Conveyance System from the City to CRW on November 4, 2013 ("Transition Agreement"). As a result of the Transition Agreement, commencing on November 4, 2013, CRW owns, operates, and maintains the AWTF and Conveyance System;

WHEREAS, at all times relevant herein prior to December 4, 2013, the City owned, operated, and maintained a collection system ("Collection System") that collects combined storm water and wastewater from residential, commercial and industrial sources. Certain portions of the Collection System receive combined sewage and other portions receive separate sewage;

WHEREAS, at all times relevant herein prior to December 4, 2013, the City owned and operated a small Municipal Separate Storm Sewer System ("MS4"), from which it was authorized to discharge and did discharge, pursuant to the MS4 General Permit to the Susquehanna River and its tributaries;

WHEREAS, the City and CRW entered into an agreement to transfer ownership, operation, and maintenance of the Collection System and MS4 from the City to CRW on December 4, 2013 ("Transfer Agreement"). As a result of the Transfer Agreement, commencing on December 4, 2013, CRW owns, operates, and maintains the Collection System and MS4.

WHEREAS, the AWTF, Conveyance System, and Collection System are authorized to discharge pollutants in accordance with CRW's NPDES Permit into the Susquehanna River and Paxton Creek in Susquehanna Watershed 7-a, which are located within the jurisdiction of the U.S. District Court for the Middle District of Pennsylvania;

WHEREAS, CRW prepared and submitted to PADEP a Long Term Control Plan ("LTCP") in January 2006 and the NPDES Permit requires implementation of the LTCP in order

to achieve Commonwealth water quality standards in accordance with the schedule therein, and the LTCP has not been implemented;

WHEREAS, in 2010 and 2012, EPA and PADEP conducted joint inspections of the Combined Sewer System and MS4 to determine Defendants' compliance with the NPDES Permit and MS4 General Permit requirements. Based on information developed by EPA and PADEP during the joint inspections, other PADEP inspections, and through further investigation including, *inter alia*, the review of required reporting and responses to Section 308 Information Requirements, EPA and PADEP have identified various violations by Defendants of the NPDES Permit requirements for the Combined Sewer System and MS4, including but not limited to: dry weather overflows from CSOs, failure to adequately implement the Nine Minimum Controls ("NMCs") in the Combined Sewer System and Minimum Control Measures ("MCMs") in the MS4, exceedances of effluent limitations at the AWTF, separate sanitary sewer overflows ("SSOs") from the separate portions of the Collection System, and failure to implement the schedule for Biological Nutrient Removal ("BNR") set forth in the NPDES Permit. EPA and PADEP have further determined that CRW's LTCP, as presently drafted, is inadequate to comply with EPA's 1994 CSO Policy ("CSO Policy"), adopted by reference into Section 402(q) of the CWA, 33 U.S.C. § 1342(q);

WHEREAS, the United States and PADEP allege CRW and the City have violated and CRW continues to violate Section 301 of the Clean Water Act, 33 U.S.C. § 1311, and Sections 3, 201, 202 and 401 of the Clean Streams Law, 35 Pa. Stat. Ann. §§ 691.3, 691.201, 691.202 and 691.401, by impermissibly discharging from the Collection and Conveyance Systems and AWTF to the Susquehanna River and Paxton Creek in violation of the NPDES Permit, and that the City has violated Section 301 of the Clean Water Act, 33 U.S.C. § 1311, and Sections 3, 201, 202 and

401 of the Clean Streams Law, 35 Pa. Stat. Ann. §§ 691.3, 691.201, 691.202 and 691.401, by discharging storm water into the Susquehanna River and its tributaries in violation of the MS4 General Permit, and that CRW continues to violate Section 301 of the Clean Water Act, 33 U.S.C. § 1311, and Sections 3, 201, 202 and 401 of the Clean Streams Law, 35 Pa. Stat. Ann. §§ 691.3, 691.201, 691.202 and 691.401, by discharging storm water into the Susquehanna River and its tributaries without a MS4 permit;

WHEREAS, the United States brings its claims pursuant to Section 309 of the CWA, 33 U.S.C. § 1319. In the Complaint, the United States seeks the imposition of civil penalties against CRW and the City, and injunctive relief against CRW, for alleged violations of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and terms and conditions of the NPDES permit last issued by PADEP as NPDES Permit No. PA-0027197, effective on January 1, 2010 and the MS4 General Permit, PAG-13;

WHEREAS, the United States, PADEP, CRW, and the City ("Parties") expressly acknowledge and agree that this Consent Decree is a partial consent decree that does not resolve any claims the Plaintiffs have for injunctive relief for CRW's alleged failure to implement an LTCP meeting the requirements of the CSO Policy and CWA or civil penalties for CRW's violations of the Clean Water Act or Clean Streams Law as alleged in the Complaint, and that this Consent Decree does not resolve any claims Plaintiffs may have for penalties or injunctive relief for violations not alleged in the Complaint filed simultaneously with this Consent Decree, and that the Parties reserve all claims and defenses that they may have concerning all these matters;

WHEREAS, the extent of the City's financial difficulties has been widely publicized and the City has further demonstrated through disclosure of financial records to Plaintiffs that it does

not have the financial capability to pay a civil penalty for its violations of the Clean Water Act or Clean Streams Law, as alleged in the Complaint. The City has cooperated in entering into the Transition Agreement and Transfer Agreement, consolidating ownership and operation of the Conveyance, Collection, and MS4 Systems with CRW, and ensuring that a Party with the financial capability to operate and maintain the Systems is responsible for carrying out the compliance obligations of this Consent Decree;

WHEREAS, nothing in this Consent Decree will be construed as an admission by CRW or the City of violations of any provisions of the CWA, the Clean Streams Law, or of CRW's current or past NPDES permits, or of the City's MS4 General Permit;

WHEREAS, the Parties recognize, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue) below, and with the consent of the Parties, IT IS HEREBY ORDERED, ADJUDGED and DECREED as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Parties and the subject matter of this action pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355.  This Court has supplemental jurisdiction over the Commonwealth law claims asserted by PADEP pursuant to 28 U.S.C. § 1367.  This Court also has personal jurisdiction over the City and CRW.  Venue is proper in this District pursuant to Section 309(b) of the CWA, 33 U.S.C.

§ 1319(b), and 28 U.S.C. §§ 1391(b) and 1395(a) because the violations alleged in the Complaint are alleged to have occurred in this judicial district.

2.     For purposes of this Consent Decree, or any action to enforce this Consent Decree, Defendants waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District.  Defendants shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

3.     For purposes of this Consent Decree, Defendants agree that the Complaint states claims upon which relief may be granted pursuant to Sections 301 and 309 of the Clean Water Act, 33 U.S.C. §§ 1311and 1319, and Sections 3, 201, 202, 401, 601, and 605 of the Clean Streams Law, 35 Pa. Stat. Ann. §§ 691.3, 691.201, 691.202, 691.401, 691.601, and 691.605.

## II.     PARTIES BOUND

4.     This Consent Decree applies to and is binding upon the United States, PADEP, and upon Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

5.     No transfer, in whole or in part, of ownership, operation, or any other interest in the AWTF, the Conveyance System, the Collection System, the MS4, or any portion thereof, shall relieve CRW of its obligations to ensure that the terms of this Consent Decree are implemented, unless (i) the transferee agrees to be substituted for the CRW as a Party under the Consent Decree and thus be bound by the terms thereof, and (ii) the United States and PADEP consent to relieve the CRW of its obligations.  The decision to refuse or to approve the substitution of the transferee for CRW shall not be subject to judicial review.  In the event of any transfer, in whole or in part, of ownership, operation, or any other interest in the AWTF, the Conveyance System, the Collection System, the MS4, or any portion thereof, CRW shall: at least sixty (60) Days prior to any such transfer, provide a copy of this Consent Decree to the proposed

transferee and simultaneously provide the Parties, in accordance with Section XVI of this Consent Decree (Notices and Submissions), with written notice of the prospective transfer, together with a copy of the proposed transfer agreement and confirmation that a copy of this Consent Decree was given to the proposed transferee. CRW will condition any transfer, in whole or in part, of ownership, operation, or other interest in the AWTF, the Conveyance System, the Collection System, the MS4, or any portion thereof, upon the transferee's agreement to assumption of responsibility for successful execution of the terms and conditions of this Consent Decree. Any attempt to transfer, in whole or in part, ownership, operation, or any other interest of any portion of the AWTF, the Conveyance System, the Collection System, or the MS4 without complying with this Paragraph constitutes a violation of this Consent Decree.

6.     Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree. CRW shall also provide a copy to each engineering, consulting, and/or contracting firm already retained to perform such work no later than thirty (30) Days after the Effective Date of this Consent Decree. CRW shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

### III.     PURPOSE

7.     The purpose of the Parties entering into this Consent Decree is to ensure that CRW undertakes measures necessary to achieve full compliance with the CWA, the regulations promulgated thereunder, including, but not limited to, 33 U.S.C. § 1342(q), and the Clean Streams Law and the regulations promulgated thereunder. The obligations in this Consent Decree, or resulting from the activities required by this Consent Decree, have the objective of causing CRW to achieve, and thereafter maintain, full compliance with the terms and conditions

of the NPDES permit, the MS4 Individual Permit, the Clean Water Act, and the Clean Streams Law, as these terms are defined in Section IV (Definitions) of this Consent Decree.

## IV. DEFINITIONS

8.      Unless otherwise expressly provided in this Consent Decree, terms used in this Consent Decree that are defined by the CWA, 33 U.S.C. § 1251-1387, by regulations promulgated pursuant to the CWA, or by the NPDES Permit shall have the meanings assigned to them by the CWA, by such regulations, or by the NPDES Permit, or, if not defined in the Clean Water Act, its regulations, or the NPDES Permit, then as defined in the Pennsylvania Clean Streams Law, 35 Pa. Stat. Ann. §§ 691.1-691.1001 and the regulations promulgated thereunder. Whenever the following terms are used in this Consent Decree, the following definitions shall apply:

a.      "Advanced Wastewater Treatment Facility" or "AWTF" shall mean the Capital Region Water Advanced Wastewater Treatment Facility owned and operated by CRW, which discharges from Outfall 001 to the Susquehanna River, and is located at 1662 South Cameron Street, Harrisburg, PA.

b.      "Building/Private Property Backup" shall mean any release of wastewater from the Harrisburg Sewer System to buildings or private property that occurs when a wastewater backup occurs into a building and is caused by blockages, flow conditions, or other conditions in the Harrisburg Sewer System.  A wastewater backup or release that is caused solely by conditions in a Private Lateral is not a Building/Private Property Backup for purposes of this Consent Decree.

c.      "City" shall mean the City of Harrisburg, a municipality and the capital city of the Commonwealth of Pennsylvania.

d.     "CRW" shall mean Defendant Capital Region Water, a municipal authority created under the Pennsylvania Municipal Authorities Act, 52 Pa. C.S.A. §§ 5601-23, and located in Harrisburg, Pennsylvania.

e.     "Clean Streams Law" shall mean the Clean Streams Law of the Commonwealth of Pennsylvania found at 35 Pa. Stat. Ann. §§ 691.1-691.1001, and the regulations promulgated thereunder.

f.     "Clean Water Act" or "CWA" shall mean the Federal Water Pollution Control Act found at 33 U.S.C. §§ 1251-1387, and the regulations promulgated thereunder.

g.     "Collection System" shall mean the municipal wastewater collection and transmission system formerly owned and operated by the City, and currently owned and operated by CRW, including sewers, manholes, and other associated appurtenances designed to collect and convey municipal sewage and wastewaters (domestic, commercial, and industrial) to the Conveyance System.

h.     "Collection System Controls" shall mean measures that reduce the volume, peak flow, or pollutant load of flows within the combined Collection System.

i.     "Combined Sewer Overflow Control Policy" or "CSO Policy" shall mean the policy issued by the U.S. EPA regarding combined sewer overflows, entitled "Combined Sewer Overflow (CSO) Control Policy," 59 Fed. Reg. 18688 (April 19, 1994) and as identified in Section 402(q) of the Clean Water Act, 33 U.S.C. § 1342(q).

j.     "Combined Sewer Overflow" or "CSO" shall mean any discharge from the Combined Sewer System at a CSO Outfall designated in the currently applicable NPDES permit.

k.      "Combined Sewer System" shall mean the Conveyance System and the portion of the Collection System designed to convey municipal sewage and wastewaters (domestic, commercial, and industrial) and storm water in the same system of pipes to the AWTF, and each Combined Sewer Overflow ("CSO") Outfall.

l.      "Consent Decree" shall mean this Consent Decree, all Appendices hereto, and all plans, schedules, reports, memoranda, or other submittals approved by the Plaintiffs pursuant to the requirements of this Consent Decree or any Appendix hereto.  In the event of any conflict between the Consent Decree and any Appendix, this Consent Decree shall control.

m.      "Conveyance System" shall mean the sewer conveyance system owned by CRW and formerly operated by the City, and currently owned and operated by CRW, including the conveyances which receive both wastewater and stormwater runoff from residential, commercial and industrial and combined sewage sources.  The Conveyance System includes pump stations, interceptor sewers, force main, combined sewer outfalls and associated regulators.

n.      "CSO Outfall" shall mean a designated location within the Combined Sewer System from which combined sewage and storm water are discharged and which are so designated in the currently applicable NPDES permit.

o.      "CSO Event" shall mean one or more untreated overflows from the Combined Sewer System as a result of a precipitation event.

p.      "Date of Lodging" shall mean the date that this Consent Decree is lodged with the Clerk of the Court for the United States District Court for the Middle District of Pennsylvania.

q.      "Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

r.      "Dry Weather Overflow" shall mean a discharge that occurs at a permitted CSO Outfall during any period of time when the hydraulic capacity of the Combined Sewer System has not been exceeded due to a precipitation event.  Overflows that are caused by any reason other than exceeded hydraulic capacity of the Combined Sewer System (e.g., debris in regulator) are Dry Weather Overflows.

s.      "Effective Date" shall mean the date set forth in Section XVIII (Effective Date) of this Consent Decree.

t.      "Effluent Limit" shall mean an effluent limitation imposed by the NPDES Permit.

u.      "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

v.      "Green Infrastructure" shall mean, for purposes of this Consent Decree, the range of stormwater control measures that use plant/soil systems, permeable pavement, or stormwater harvest and reuse, to store, infiltrate, or evapotranspirate stormwater and reduce flows to the Combined Sewer System.  Green Infrastructure may include, but is not limited to, bioretention and extended detention wetland areas, as well as green roofs and cisterns.

w.      "Harrisburg Sewer System" shall mean the Collection System, Conveyance System, and AWTF, collectively.

x.     "Hydrologic and Hydraulic Model" or "H&H Model" shall mean the model developed pursuant to the requirements of this Consent Decree in support of Long Term Control Plan development efforts.

y.     "Infiltration" shall mean water other than wastewater that enters the Harrisburg Sewer System, as defined by 40 C.F.R. § 35.2005(b)(20).

z.     "Inflow" shall mean water other than wastewater that enters the Harrisburg Sewer System, as defined by 40 C.F.R. § 35.2005(b)(21).

aa.     "Infiltration/Inflow" and "I/I" shall mean infiltration and/or inflow without distinguishing the source.

bb.     "Initial Flow Metering and Monitoring Program Plan" or "IFMMPP" shall mean the plan for a flow metering and monitoring program developed by CRW, the final version of which is to be implemented under this Consent Decree in support of Long Term Control Plan development efforts.

cc.     "Minimum Control Measures" or "MCMs" shall mean those controls identified in Section II.A.2. of the NPDES Stormwater Phase II Final Rule, 64 FR 68736, and Part A.2 of the MS4 General Permit PAG-133686 under which the City had coverage.

dd.     "MS4 General Permit" shall mean the NPDES General Permit No. PAG-13, issued on March 9, 2003 and administratively extended until March 15, 2013, and/or the renewed NPDES General Permit No. PAG-13 effective March 16, 2013 through March 15, 2018, under which the City had coverage under No. PAG-133686.

ee.     "MS4 Individual Permit" shall mean any NPDES permit issued to CRW by PADEP, based on a permit application developed by CRW in accordance with the

requirements of Section V.C. of this Consent Decree and applicable Federal and State regulations.

   ff. "MS4" shall mean the Municipal Separate Storm Sewer System that is the subject of the MS4 Individual Permit, which consists of conveyances (including roads with drainage systems, municipal streets, catch basins, inlets, curbs, gutters, ditches, and storm drains) designed to collect, convey, and directly discharge storm water to receiving waters.

   gg. "Nine Minimum Controls" or "NMCs" shall mean those controls identified in Section II.B. of the EPA's April 19, 1994, Combined Sewer Overflow (CSO) Control Policy.

   hh. "Nine Minimum Controls Plan" or "NMC Plan" shall mean the plan developed in accordance with the requirements of Section V.B. of this Consent Decree (Compliance Measures).

   ii. "NPDES Permit" shall mean the currently effective NPDES Permit No. PA-0027197, effective on January 1, 2010, issued to CRW by PADEP.  This definition includes any future modifications, extensions, amendments, renewal, or reissuance of this Permit in accordance with 40 C.F.R. Part 123.

   jj. "PADEP" shall mean the Pennsylvania Department of Environmental Protection and any successor departments or agencies of the Commonwealth of Pennsylvania.

   kk. "Paragraph" shall mean a provision of this Consent Decree identified by an Arabic number.

   ll. "Parties" shall mean the United States, PADEP, the City, and CRW.

   mm. "Plaintiffs" shall mean the United States and PADEP.

nn.     "Private Lateral" shall mean pipes and any other appurtenances not owned by CRW that are used to convey wastewater from a building or buildings to the Harrisburg Sewer System owned by CRW.

oo.     "Receiving Water" shall mean the portion of a water body that receives or is impacted by the discharges from one or more CRW CSOs.

pp.     "Sanitary Sewer Overflow" or "SSO" shall mean an overflow, spill, diversion, or release of wastewater from or caused by the Separate Sanitary Sewer System.  This term shall include: (i) discharges to waters of the Commonwealth or United States from the Separate Sanitary Sewer System and (ii) any release of wastewater from the Separate Sanitary Sewer System to public or private property that does not reach waters of the United States or the Commonwealth of Pennsylvania, including but not limited to Building/Private Property Backups.

qq.     "Section" shall mean a portion of this Consent Decree identified by an uppercase Roman numeral, unless the Consent Decree states that the "Section" referred to is a Section of the Clean Water Act or NPDES Permit.

rr.     "Semi-Annual Report" shall mean the written status report required under Section VII (Reporting Requirements) that CRW shall submit on its progress implementing the Consent Decree for semi-annual review, which report will incorporate the format set forth in Appendix A to this Consent Decree.

ss.     "Sensitive Areas" shall mean those areas designated by PADEP, in coordination with state and federal agencies, as appropriate, Outstanding National Resource Waters, National Marine Sanctuaries, waters with threatened or endangered species and their habitat, waters with primary contact recreation, public drinking water intakes or their designated protection areas, and shellfish beds, as set forth in Section II.C.3. of the CSO Policy.

tt.     "Separate Sanitary Sewer System" shall mean any portion of the Collection System designed to convey municipal sewage and wastewaters (domestic, commercial, and industrial) to the AWTF in one system and storm water in a separate system.

uu.     "Sewershed" shall mean a delineation of the land area contributing stormwater and/or wastewater to a single downstream point within the Conveyance System.

vv.     "Source Controls" shall mean measures that reduce the volume, peak flow, or pollutant load of runoff, either before it enters the combined Collection System or is re-directed to an MS4, including measures that mimic natural hydrologic processes. Source Controls shall include, *inter alia*, Green Infrastructure, as defined in this Consent Decree.

ww.     "Storage Technologies" shall mean structural measures that detain flows within the Conveyance System and reduce peak flows prior to treatment at the AWTF.

xx.     "Subparagraph" shall mean a portion of this Consent Decree that is identified by a sequential lower-case letter, a lower-case Roman numeral, or an Arabic number in parenthesis.

yy.     "Surcharge Conditions" shall mean the conditions that exist when the wastewater surface within a manhole rises above the top of the sewer, or the separate sanitary sewer is full and under pressure, rather than at atmospheric pressure and less than completely full.

zz.     "Treatment Technologies" shall mean structural measures that reduce the pollutant load in a CSO to its Receiving Water.

aaa.     "Unauthorized Release" shall mean any overflow, spill, diversion, or release of wastewater within the Combined Sewer System at a location other than a CSO Outfall. This term shall include any release of wastewater from the Combined Sewer System to public or

private property that does not reach waters of the Commonwealth or United States, including Building/Private Property Backups.

bbb. "United States" shall mean the United States of America, acting on behalf of EPA.

## V. COMPLIANCE MEASURES

### A. PERMANENT INJUNCTION

9. CRW shall achieve and maintain full compliance with the terms and conditions of the NPDES Permit, the MS4 Individual Permit, the provisions of the CWA, 33 U.S.C. §§ 1281 et seq., and Pennsylvania Clean Streams Law, 35 Pa. Stat. Ann. §§ 691.1-691.1001, and the rules promulgated thereunder and with the compliance program and the schedule set forth below.

### B. LEGAL AUTHORITY

10. CRW and the City shall confer and enter into one or more formal agreement(s) in order to secure CRW's legal authority, including any appropriate enforcement authority that may be legally transferred, and responsibility for operating and maintaining all portions of the Harrisburg Sewer System and the MS4, which will cover at a minimum the following:

a. the legal authority to inspect and regulate grease traps from restaurants, schools, and other facilities with food services;

b. the legal authority to inspect and regulate businesses and/or other customers that may be contributing waste streams other than domestic sewage to the Conveyance and Collection systems;

c. the legal authority to implement all MCMs in the MS4, and any other requirements of the Individual MS4 Permit, including specifically the authority to address the

elimination of illicit discharges to the MS4 and the authority to implement and enforce a

program for post-construction storm water management in new development and redevelopment;

        d.      the maintenance and repair of connections to the Harrisburg Sewer System

and the MS4.

At least an interim resolution regarding the agreement(s) between CRW and the City required

pursuant to this Paragraph, which transfers the necessary legal authority to CRW, shall be

negotiated and effective by no later than the Date of Lodging of this Consent Decree.  The

agreement(s) shall set forth an expeditious schedule for CRW and the City to implement the

necessary rules, regulations, ordinances, and other legal mechanisms required under the

agreement(s).  The NMC Plan prepared under Paragraph 11, and the MS4 Individual Permit

Application prepared under Paragraph 13, shall also include the schedule for CRW and the City

to implement necessary rules, regulations, ordinances, and other legal mechanisms relevant to

the NMC Plan and MS4 compliance, respectively.  Copies of the interim resolution and all

agreement(s) shall be provided to Plaintiffs pursuant to Section XVI (Notices and Submissions)

of this Consent Decree.

## C.      NINE MINIMUM CONTROLS

      11.      Within six (6) months of the Date of Lodging of this Consent Decree, CRW shall

prepare and submit to Plaintiffs for review and approval a revised and updated Nine Minimum

Controls Plan, in accordance with Section VI (Review and Approval of Deliverables).  The NMC

Plan shall evaluate and document the current level of implementation of the NMCs within the

Combined Sewer System, and shall identify and include an implementation schedule for actions

necessary for achieving compliance with the CSO Policy for all NMCs, including, but not

limited to, the specifically identified actions set forth below, within the timeframe(s) determined

through the NMC Plan review and approval process.  The identified actions shall be in

accordance with the CSO Policy and the "Guidance for Nine Minimum Controls," EPA 832-13-95-003, May 1995 ("NMC Guidance").

a. **Conduct Proper Operation and Regular Maintenance of the Conveyance and Collection Systems.** CRW shall develop and implement an Operation and Maintenance Program ("O&M Program") for the Conveyance and Collection Systems. In support of the O&M Program, CRW shall prepare, maintain, and implement a CSO Operation & Maintenance Manual ("OMM") for the Conveyance and Collection Systems, describing Standard Operating Procedures and Schedules for the remedial and routine operation, inspection, maintenance, and training activities it conducts in compliance with the NMCs. The OMM shall be submitted to Plaintiffs for review and approval as part of the NMC Plan in accordance with Section VI (Review and Approval of Deliverables). The OMM shall be reviewed and updated by CRW as necessary to address improved system information, but at least once each calendar year, and be submitted to Plaintiffs if changes are warranted at the same time CRW submits its Chapter 94 Report, and in accordance with Section VI (Review and Approval of Deliverables), continuing until termination of this Consent Decree pursuant to Section XX (Termination). Following Plaintiffs' approval of the updated Long Term Control Plan pursuant to Paragraph 14, CRW shall revise the OMM as necessary to include long-term O&M requirements for CSO controls required by the updated Long Term Control Plan. The OMM shall include, but not be limited to, the following listed elements:

i. A list of existing facilities and equipment critical to the performance (i.e., critical components) of the Collection and Conveyance Systems and AWTF, to be updated as necessary to address improved system information resulting from field inspection, hydraulic modeling, and/or other activities;

ii.   A program to divide the Conveyance and Collection Systems into different sewersheds and catchments for the purposes of organizing the Systems;

iii.   A program to locate, characterize, and map the diameter, length, elevation, construction material, and installation date (where known) of CRW's Conveyance and Collection Systems;

iv.   A program to evaluate the structural integrity and maintenance needs of the Conveyance and Collection Systems through internal inspections utilizing state of the industry technology (e.g., laser, sonar, closed circuit television), and, where appropriate, visual inspections of reported sinkholes and the ground surface along the length of the system, placing highest priority on the components most critical to overall hydraulic performance and/or components with known structural defects (e.g., areas with sinkholes or higher than average number of emergency pipe repairs, areas with basement backups), and at locations where a hydraulic or structural failure would significantly impact public health, safety, or welfare;

v.   A program to inventory and inspect all Force Mains in the Conveyance System, listing all Force Mains in the System and indicating the associated Force Main construction material, age, or installation date, diameter, length, special corrosion protection measures, if any, and typical flow rates, and to develop a schedule to periodically evaluate the structural integrity, maintenance needs, and remaining service life of each Force Main, including consideration of both internal and right of way inspection methodologies, and provisions for internal inspection any time a portion of the Force Main is taken out of service for maintenance and repair;

vi.   A program to track and record citizen complaints and service requests pertaining to the Conveyance and Collection Systems and the corrective actions taken to address the complaints;

vii.   A program to identify and prioritize remedial work determined based on the findings of internal and visual inspections (Paragraphs 11(a)(iv) and (v)), CSO Outfall inspections (Paragraph 11(b)(i), (iv)), engineering studies to maximize storage in the Collection System (Paragraph 11(b)(ii)), flow to the POTW (Paragraph 11(c)(i)), control of solid and floatable material (Paragraph 11(e)), response to citizen complaints and service requests (Paragraph 11(a)(vi)),  hydrologic and hydraulic ("H&H") Modeling results, recommendations of the Capacity Assessment Report (Paragraph 30(c)(ii)) when completed, and other available information, as necessary to prevent pipe failure, resolve severe hydraulic bottlenecks including bottlenecks caused by debris buildup in interceptors, reduce infiltration/inflow volumes, and limit river intrusion volumes.  The order in which remedial work identified through the program established pursuant to this Subparagraph is completed may be prioritized in accordance with need, but all remedial work identified must be scheduled and completed;

viii.   A list that identifies and prioritizes equipment purchases for critical equipment identified in Paragraph 11(a)(i), to be updated at necessary to address improved system information resulting from field inspection, hydraulic modeling, and/or other activities;

ix.   An O&M training program to be required of personnel conducting O&M activities;

x.   Regularly scheduled regulator and outfall inspections with procedures that can accurately detect and document wet and dry weather CSO discharge events;

xi.   A program, including Standard Operating Procedures, for remedial, routine, preventative, emergency, and as-needed maintenance of the Conveyance and Collection Systems, to preserve its hydraulic capacity, minimize gate blockages, minimize discharge of solids and floatables during CSO events, and maintain operation of the Systems, including but not limited to:

1.      Remedial, routine, preventative, emergency, and as-needed inspection and cleaning of catch basins to remove sources of gate blockages;

2.      Remedial, routine, preventative, emergency, and as-needed inspection, cleaning and other necessary maintenance of sewers and manholes in the Collection and Conveyance Systems;

3.      Remedial, routine, preventative, emergency, and as-needed inspection and maintenance of each pump station in the Collection and Conveyance Systems;

4.      Procedures for documenting remedial, routine, preventative, emergency, and as-needed maintenance problems in the Collection and Conveyance Systems;

5.      Identification of the cause of CSOs (e.g. wet weather, mechanical failure, inadequate O&M);

6.      Investigation of sinkholes where sewer system defects are suspected, and identification and repair of sinkholes caused by structural deterioration of the Collection or Conveyance Systems;

7.      Inspections of grease traps from restaurants, schools, and other facilities with food services;

8.     Inspections of businesses and/or other customers that may be contributing waste streams other than domestic sewage; and

9.     Annual planning and budgeting procedures to define the organization, staffing, and resources needed to properly operate and maintain the Collection and Conveyance Systems.

10.     Investigation and minimization of sources of floatables, solids, or other materials that cause blockages and/or reduce the hydraulic capacity of the Conveyance and Collection Systems.

b.     **Maximize Use of Storage in Collection System**.  CRW shall, as part of its O&M Program described in Paragraph 11(a), above:

i.   Investigate the condition and effectiveness of currently installed measures to prevent river intrusion into the Combined Sewer System (e.g., gaskets on river gates and duckbill valves attached to outfalls).  Utilizing the results of the investigation and taking into account previous documentation of observed intrusion occurrences, CRW shall perform necessary repairs, replacements, and maintenance to prevent river intrusion into the Combined Sewer System; and

ii.   Conduct an engineering study, through internal investigations and hydraulic modeling, to identify Priority Remedial Work that can be conducted to maximize in-pipe storage once the study is completed (e.g., adjustment of weir heights, prevention of river intrusion into Combined Sewer System).

iii.   Identify portions of the Combined Sewer System that accumulate debris, grit, and sediment, and identify appropriate frequencies for routine removal of debris, grit, and sediment from such portions of the Combined Sewer System;

iv.    Identify locations where river intrusion occurs through cracked and damaged CSO Outfall pipes (i.e., pipes that lead from regulators to the Susquehanna River or Paxton Creek and associated river gates), and develop a priority list and repair schedule for any necessary monitoring, repair, or replacement of any such cracked or damaged pipes.

c.    **Maximization of Flow to POTW for Treatment**.  CRW shall take the following measures to maximize flow in the Combined Sewer System to the AWTF:

i.  Utilize hydraulic modeling and/or other engineering studies, as appropriate, to evaluate, recommend, and support implementation of simple modifications to the Conveyance System that maximize the combined wastewater flows to the AWTF during wet weather events (e.g., evaluate capacities of interceptors and pumping stations delivering flows to the AWTF, and wet weather flow rates to the AWTF compared to typical dry weather flows). The following maximization procedures will be implemented, as necessary:

1.    Assuring proper performance of all sewers, structures, and equipment in the Combined Sewer System and AWTF;

2.    Adjusting CSO diversion weirs or other devices to the degree possible without causing in-system surcharge or Building/Private Property Backups to reduce CSO activity;

3.    Evaluating the benefits of any inflow and infiltration (I&I) reduction projects.

ii.  CRW shall annually review and revise maximization procedures as necessary for continued maximization of flow to the AWTF for treatment.

d.    **Elimination of CSOs During Dry Weather**.  Dry Weather Overflows from CSOs are prohibited and shall be reported to PADEP by telephone at 866-825-0208

immediately, but no later than four (4) hours after CRW becomes aware of the Dry Weather Overflow, and CRW must provide written notification to PADEP within five (5) Days of when CRW becomes aware of the Dry Weather Overflow.  The following information about Dry Weather Overflows shall also be reported in the Semi-Annual Reports required by Section VII of this Consent Decree:

      i.   The number of reported Dry Weather Overflow events that have occurred;

      ii.   A detailed description of the causes of Dry Weather Overflows, and the actions that CRW has taken and will take in the future to prevent recurrence;

      iii.   The existing methods used for detecting Dry Weather Overflows and their efficacy;

      iv.   The remedial measures taken for pollution deposited in Receiving Waters or onto the stream banks after a Dry Weather Overflow;

      v.   The environmental impacts of Dry Weather Overflow events.

      e.    **Control of Solids and Floatable Material**.  CRW shall operate and maintain the existing Combined Sewer System in accordance with the OMM to control solid and floatable materials discharged from all CSO outfalls and shall have these materials removed should a visible accumulation of these materials be deposited in the Receiving Water or onto the stream bank.  CRW shall conduct annual evaluations of past performance and implement corrective actions to reduce the presence of solids and floatable materials in CSO discharges and the Receiving Waters.  The procedure for these evaluations shall be set forth in the OMM.  Actions taken to control solid and floatable materials shall be reported as required by Section VII of this Consent Decree.  CRW shall consider for implementation at least the solids and floatables control technologies set forth in the NMC Guidance.

f.     **Public Notification**.  CRW shall implement the public notification procedures set forth in the NMC Plan and document their implementation in Semi-Annual Reports submitted under Section VII of this Consent Decree, including the following items:

i.   CRW shall install and continuously maintain signs at each CSO outfall that notify and alert the public to avoid contact with waters near or downstream of discharging CSO outfalls.  Signage shall, at a minimum, be installed within ten (10) feet of each CSO outfall point, and sign dimensions shall be at least 18" x 24", made from durable weatherproof material, and be visible to the unaided eye from both land and water from a distance of one hundred (100) feet;

ii.   CRW shall also install warning signs, as specified in Paragraph 11(f)(i), at public stream access points (e.g. boat launches, beaches) that notify and alert the public to avoid recreational contact with waters during or just after any wet weather event;

iii.   CRW shall develop written procedures to provide the public with information concerning CSO discharge occurrences and their impacts on water quality in the Receiving Water(s) (e.g., website notifications within 24 hours of the event, public service announcements on radio and/or television, newspaper public notifications) that contain information regarding the locations of the discharges;

iv.   CRW shall distribute CSO pamphlets for education of the general public;

v.   CRW shall evaluate and document any CSO public education programs and the community's response to such programs and any follow-up plans addressing public education based on public response;

vi.   CRW shall investigate and document any public involvement including any concerns expressed, and comments or suggestions made by the public concerning CSOs, and take any corrective measures warranted.

vii.   CRW shall consider implementation of email and/or text message public notification systems for CSO, DWO, and Unauthorized Release events.

g.     **Monitoring to Characterize CSO Impacts to Receiving Waters and the Efficacy of CSO Controls**.  CRW shall use the following phased approach to characterize CSO impacts and control efficacy:

i.   During Phase 1, scheduled to occur between the Date of Lodging of this Consent Decree and the approval of the CSO Activation Pilot Study performed under Paragraph 31(d), CRW shall employ visual inspections and other simple methods, supplemented by characterization and monitoring efforts conducted under Paragraphs 15 through 21, in support of LTCP development, to determine the occurrence and apparent impacts of CSOs.  During Phase 1, CRW shall conduct visual inspections of each CSO regulator chamber and CSO outfall within the Combined Sewer System once per Day, seven (7) Days per week.  CRW shall continue to use tethered blocks and/or chalk in each regulator to detect overflow activity.  Observations made by the inspector(s) shall be recorded in a consistent manner on pre-printed forms or bound logbooks, and shall include the following: name of the inspector(s), the date and time of the inspection, status of the regulator (e.g., overflowing, block displacement or chalk wash-off since last inspection, no sign of overflow), weather conditions (including amount of rainfall, if any), and any observed maintenance issues.

ii.   During Phase II, scheduled to occur between the approval of the CSO Activation Pilot Study and the approval of the Post-Construction Monitoring Program prepared

under Paragraph 24(j), CRW shall utilize a combination of visual inspections and technology (including H&H Modeling), the type of which shall be determined by the results of the CSO Activation Pilot Study required pursuant to Paragraph 31(d) of this Consent Decree, to accurately measure the volume, duration, and start/stop time of all CSO discharges. The location, frequency, and method of visual inspection will be refined as recommended under the CSO Activation Pilot Study;

      iii. During Phase III, CRW shall implement the approved Post-Construction Monitoring Program prepared under Paragraph 24(j) following its approval by EPA.

      iv. During all three Phases, total daily rainfall amounts in at least five (5) minute increments will be recorded from rain gauges located in the region. As additional rain gauges are installed as part of the IFMMPP, such gauges shall also be maintained and continuously monitored to measure precipitation within the Combined Sewer System drainage areas;

      v. CRW shall document the procedures used to collect and summarize data concerning the total number of CSO overflow events (both wet and dry weather) and the frequency and duration of CSOs. CSO overflow events occurring within 48 hours of a precipitation event shall not be presumptively characterized as wet weather overflows. CRW shall monitor and maintain a record of CSO activity, including occurrence, duration and volume for all overflow events that occur at CSO Outfalls in Defendants' Combined Sewer System. CRW shall also record rainfall data during these CSO overflow events. The CSO flow monitoring data and rainfall data shall be submitted to the Plaintiffs in the Semi-Annual Reports required by Section VII of this Consent Decree;

      vi. Once the H&H Model is developed and calibrated pursuant to Paragraph 15(g), and accepted as adequately calibrated by EPA and PADEP, CRW shall utilize the calibrated

H&H Model and the rainfall data to characterize CSO discharges and report them in Semi-Annual Reports as required by Section VII of this Consent Decree. In using the calibrated model to characterize its CSO discharges, CRW shall continue to utilize rainfall data from at least six (6) continuously recording rainfall gauges appropriately located in the Harrisburg Sewer System area, and shall continue to collect and maintain rainfall data for the pendency of this consent decree. CRW shall also procure and utilize Gauge Adjusted Radar Rainfall ("GARR") data at a one (1) virtual gauge per square kilometer spacing. After one year of such use of the H&H Model, CRW may carry out comparative model runs to evaluate the impact of eliminating GARR data or using GARR at reduced virtual gauge density (i.e., greater spacing), and if the results of this evaluation demonstrate no impact to the H&H Model characterization of CSO activation frequency and volume, CRW may submit to EPA and PADEP a detailed technical memorandum describing the analyses carried out and the results of the analyses, and may petition EPA and PADEP for approval to eliminate GARR data or reduce the GARR density procured.

      12.   <u>Ongoing Review of the NMC Plan</u>. CRW shall, on at least an annual basis, evaluate the efficacy of the measures implemented under the NMC Plan, as well as other measures undertaken by CRW pursuant to this Consent Decree, in achieving water quality standards in receiving waters. Based on such evaluation, for the first five (5) years following initial submission of the NMC Plan pursuant to Paragraph 11, CRW shall submit to Plaintiffs for review and approval a proposed revised plan (in redline format) including an implementation schedule of any additional actions necessary to comply with the NMCs. CRW shall implement these actions, upon approval by Plaintiffs, in accordance with the provisions and schedules set forth therein.

**D.    MINIMUM CONTROL MEASURES – STORMWATER DISCHARGES**

13.    By October 1, 2014, CRW shall develop and submit for review and approval an MS4 Individual Permit application for operation of the MS4, in accordance with applicable Federal and State regulations.  The Stormwater Management Plan to be developed as part of CRW's MS4 Individual Permit application shall set forth procedures and schedules for complete implementation of all the Minimum Control Measures, including specifically, but not limited to:

a.    **Detection and Elimination of Illicit Discharges into MS4**.  CRW shall develop a map of the MS4 that contains an internal coding system and individual identifiers for all the MS4 Outfalls.  CRW shall also develop a list of priority areas for illicit discharge detection within the MS4, shall conduct regular inspections and dry weather field screening in the priority areas, shall conduct follow-up investigations to identify and seek elimination of illicit discharges, and shall report on illicit discharge detection and elimination efforts in accordance with the requirements of the MS4 Individual Permit.

b.    **Implement and Enforce a Program for Post-Construction Storm Water Management in New Development and Redevelopment**.  CRW shall develop a process for reviewing post-construction storm water runoff best management practices ("BMPs") and shall develop and implement an inspection program that ensures post-construction BMPs are properly constructed, operated, and maintained.  CRW also shall develop an inventory of post-construction BMPs (e.g., swales, rain gardens, retention ponds).

**E.    LONG TERM CONTROL PLAN**

14.    Long Term Control Plan Development.  By no later than April 1, 2018, CRW shall complete and submit a revised and updated Long Term Control Plan ("LTCP") to Plaintiffs for review and approval in accordance with the requirements of Section VI (Review and Approval of Deliverables).  The updated LTCP shall conform to the requirements of the EPA's

CSO Policy and EPA's "Guidance for Long-Term Control Plan," EPA 832-B-95-002, September 1995, and consider EPA's "Greening CSO Plans: Planning and Modeling Green Infrastructure for Combined Sewer Overflow (CSO) Control, EPA 832-R-14-001, March 2014, and EPA's Integrated Municipal Stormwater and Wastewater Planning Approach Framework Memorandum, dated June 5, 2012. The updated LTCP shall include schedules, deadlines and timetables for remedial measures designed to meet the following goals:

a.      Bring all CSO discharge points into full compliance with the technology-based and water quality-based requirements of the CWA; and

b.      Minimize the impacts of CSOs on water quality, aquatic biota, and human health.

15.     <u>Initial Flow Metering and Monitoring Program Plan</u>. CRW shall implement the final Initial Flow Metering and Monitoring Program Plan ("IFMMPP"), and in accordance with the IFMMPP shall complete the following activities in support of system characterization, hydrologic and hydraulic model ("H&H Model") calibration, and LTCP development according to the schedule in the final IFMMPP:

a.      Map and inspect the condition of both the Combined and Separate Sanitary Sewer Systems, as described in Paragraphs 11(a)(ii) – (v);

b.      Divide the Combined and Separate Sanitary Sewer Systems into sewersheds and catchments as described in Paragraph 11(a)(ii);

c.      CRW shall upgrade (repair, or replace, as necessary) the flow meters measuring flow coming from the satellite communities into the Combined Sewer System by December 31, 2015. CRW shall utilize the upgraded meters to monitor the flow contribution

from the satellite communities at the four locations shown in the final IFMMPP for the pendency of this Consent Decree;

d. Install and document the installation of at least six (6) continuously recording rainfall gauges appropriately located in the Harrisburg Sewer System area, and collect and maintain rainfall data for the pendency of this Consent Decree for purposes of the IFMMPP and to satisfy the requirements of Paragraph 11(g)(iv). CRW shall also procure Gauge Adjusted Radar Rainfall ("GARR") data for the CRW service area, and shall continue to procure such data as necessary pursuant to Paragraph 11(g)(vi);

e. Install flow monitoring devices on the major trunk sewers tributary to the thirteen (13) critical or key CSO outfalls in the Combined Sewer System identified in the final IFMMPP, and on the nine (9) interceptor sites identified in the final IFMMPP, monitor flow and collect data on both wet weather and dry weather flows consistent with the IFMMPP for the purposes of H&H Model Calibration and Validation (a minimum of twelve (12) months).

f. Prepare and submit to Plaintiffs for review and comment quarterly technical memoranda documenting the results and quality of the flow monitoring data. If, following review of the second quarterly technical memorandum, Plaintiffs agree that the flow monitoring data being collected is of sufficient quality and extent to support H&H Model Calibration and Validation, CRW may plan to remove all CSO monitoring technologies installed pursuant to the IFMMPP at the conclusion of the planned monitoring period if no degradation in data quality occurs. If, following review of the second quarterly technical memorandum, Plaintiffs do not agree that the flow monitoring data being collected is of sufficient quality and extent to support H&H Model Calibration and Validation, CRW shall retain and continue to operate all CSO monitoring technologies installed pursuant to the IFMMPP until such time as

CRW provides written justification of the sufficiency and extent of the flow monitoring data for the purposes of supporting H&H Model Calibration and Validation and Plaintiffs provide a written response to CRW affirming the sufficiency of the monitoring data.  Under no circumstances shall CRW collect less than one full calendar year of monitoring data.

       g.      Utilize rainfall and flow monitoring data collected pursuant to the IFMMPP to revise, calibrate, and validate the H&H Model of the Conveyance and Collection Systems using the EPA SWMM 5 modeling platform.  The H&H Model shall specifically include the entire Conveyance System (i.e., each regulator, each CSO Outfall, each pump station, each interceptor) and Combined Collection System trunk sewers of 42-inch diameter or greater plus at least an additional ten (10) percent of the system for model continuity and/or that hydraulically impact known chronic Unauthorized Releases.  The Parties understand that this effort will result in the explicit inclusion in the H&H Model of a total of at least fifteen (15) to twenty (20) percent of the Combined Sewer System as measured by feet of pipe, as well as all portions of the Separate Sanitary Sewer System specified by Paragraph 30(b).

       h.      Following revision, calibration, and validation of the H&H Model of the Conveyance and Collection Systems, submit a Sewer System H&H Model Report to Plaintiffs for review and approval in accordance with the requirements of Section VI (Review and Approval of Deliverables) by April 1, 2016.   The Sewer System H&H Model Report shall include at least the following components:

       i.  Introduction

            1.  Background

            2.  Scope and Objectives

            3.  System Description

ii. Sewer Model Refinement, Calibration, and Validation

    1. Methodology

    2. Hydraulic Model Refinement

    3. Flow Data Assessment

    4. Dry Weather Flow Calibration, including quantitative and qualitative calibration criteria

    5. Wet Weather Flow Calibration, including quantitative and qualitative calibration criteria

    6. Model Validation

16. <u>LTCP Approach and Pollutants of Concern</u>. By December 30, 2014, CRW shall coordinate with EPA and PADEP to determine what approaches to LTCP Alternative Evaluation (i.e., Presumptive or Demonstration) are appropriate for each of CRW's Receiving Waters, and what the pollutants of concern are in each Receiving Water, to be determined consistent with EPA's "Guidance for Long-Term Control Plan," EPA 832-B-95-002, September 1995. Use of the Presumption Approach will be allowed only where EPA and PADEP together agree that the specific presumption(s) to be used in a particular Receiving Water are reasonable. As part of this coordination, CRW shall propose an approach for each of its Receiving Waters. For each Receiving Water for which the Presumption Approach is proposed, CRW shall present qualitative and quantitative information supporting the reasonableness of the proposed presumption criteria. CRW shall also propose pollutants of concern for each Receiving Water. For each Receiving Water, CRW shall review existing water quality data and recent PADEP Clean Water Act Section 303(d) listings to identify pollutants of concern. Even if a Receiving Water has not been formally listed as in non-compliance with its water quality standards and

designated uses, if available data indicates such impairment exists, CRW shall consider the related pollutants to be pollutants of concern.  Where one pollutant of concern can be shown to be consistently more protective than another pollutant of concern for all feasible CSO controls, the most protective parameter may be utilized.

17.     Water Quality Modeling Plan.  If CRW will utilize the Demonstration Approach in one or more Receiving Waters, then by August 1, 2015, CRW shall submit to EPA and PADEP a Water Quality Model Plan for review and approval pursuant to Section VI (Review and Approval of Deliverables), and shall implement the approved Water Quality Model Plan in accordance with the schedule included therein.  For each water body in which the Demonstration Approach is to be used, the Water Quality Model Plan shall address:

a.      Water quality modeling software to be employed;

b.      Model configuration, including reaches to be modeled and segmentation and boundary conditions;

c.      Calibration and validation, including events and data to be employed, quantitative and qualitative calibration criteria, and utilization of H&H Model outputs;

d.      Use of the Water Quality Model to evaluate Typical Year in-stream conditions for each identified pollutant of concern;

e.      Schedule for model development and implementation, including integration into LTCP development consistent with other dates required pursuant to this Consent Decree.

18.     Financial Capability Analysis.  By April 1, 2016, CRW shall submit to Plaintiffs for review and comment a Financial Capability Analysis carried out in accordance with EPA's "Combined Sewer Overflows – Guidance for Financial Capability Assessment and Schedule

Development" (EPA 832-B-97-004), including information on sewer rate setting, definition of the service population of the Harrisburg Sewer System, and median household income of the service population.

19.     Sensitive Areas/Priority Areas.  By April 1, 2016, CRW shall submit to Plaintiffs for review and approval in accordance with the requirements of Section VI (Review and Approval of Deliverables) a report or technical memorandum that addresses the topics of Sensitive Areas/Priority Areas in the Harrisburg Receiving Waters.  CRW shall carry out adequate and appropriate investigation of each type of Sensitive Area, including inquiries of appropriate state and federal agencies, and shall include detailed documentation of those efforts.

20.     Typical Year.  By August 1, 2015, CRW shall submit to Plaintiffs for review and approval in accordance with the requirements of Section VI (Review and Approval of Deliverables) a report or technical memorandum describing CRW's statistical evaluation of long-term local rainfall patterns and the identification of an appropriate Typical Year for LTCP development purposes.  This statistical evaluation shall utilize an appropriate local long-term rainfall record, and shall consider various appropriate rain year characteristics, including distributions of event rainfall totals, event durations, and peak and average rainfall intensities.

21.     Existing System Characterization.  By April 1, 2017, CRW shall submit an Existing System Characterization that includes all of the information required by CSO Policy Section II.C.1 to Plaintiffs for review and approval in accordance with the requirements of Section VI (Review and Approval of Deliverables).  The Existing System Characterization shall include, but not be limited to, the following:

        a.      CRW shall utilize the H&H Model updated, calibrated, and validated under Paragraph 15 to characterize the expected volume, frequency, and duration of

CSO discharge events from each CSO during the Typical Year as identified in Paragraph 20, above, based on an inter-event period of six (6) hours;

b.      CRW shall incorporate the results of its investigation of Priority Areas and Sensitive Areas, as required by Paragraph 19, above;

c.      CRW shall provide a characterization of current water quality in its Receiving Waters, based upon all available data, use of its Water Quality Model(s) in Receiving Waters in which the Demonstration Approach is being utilized, and its efforts to identify pollutants of concern as required by Paragraph 16, above.

22.      <u>Alternatives Evaluation</u>.  CRW shall carry out an Alternatives Evaluation that complies with the requirements of the CSO Control Policy Section II.C.4, and that is consistent with EPA's "Guidance for Long-Term Control Plan," EPA 832-B-95-002, September 1995.  The Alternatives Evaluation shall consist of: (1) the identification of feasible CSO control technologies, (2) a detailed evaluation of an appropriately wide range of specific CSO control alternatives and sizes of those alternatives, and (3) selection of an appropriate suite of proposed CSO controls to achieve compliance with the Clean Water Act.  CRW shall specifically evaluate the feasibility of eliminating or relocating all CSO Outfalls that discharge to Sensitive Areas, and shall give a high priority to the control of CSO Outfalls that discharge to Priority Areas, and those that have the highest frequency or greatest volume of discharge of wastewater.

a.      <u>Identification of Feasible CSO Control Technologies</u>.  CRW shall assess the technical feasibility of the use of a wide range of demonstrated CSO control technologies in the Combined Sewer System.  CRW shall provide descriptions of the follow types of CSO Control technology – Source Controls (e.g., Green Infrastructure), Collection System Controls, Storage Technologies, and Treatment Technologies – and an assessment of the feasibility of

applying each technology type for long-term CSO control in the Combined Sewer System, based on existing and anticipated future conditions affecting CRW's Conveyance and Collection Systems. This evaluation is not intended to consider cost or cost effectiveness, but rather to exclude control technologies that are not technically or physically applicable to CRW's system. Partial and complete separation of sewers in each of CRW's CSO Outfall tributary areas, and deep tunnel storage, shall be considered feasible technologies for this purpose and be carried forward for further evaluation.

b.  <u>Evaluation of CSO Controls</u>.  CRW shall, by the application of sound engineering practices and thorough knowledge of the Collection and Conveyance Systems, identify an appropriately broad range of feasible CSO controls for detailed evaluation, as set forth below. As appropriate based on the characteristics of the Collection and Conveyance Systems, feasible CSO controls shall be developed that are CSO-specific, specific to clusters of CSOs, or specific to larger portions of the Combined Sewer System (e.g., all CSOs located along one bank of a water body), including System-wide controls. CRW may apply engineering judgment to limit its evaluation of functionally equivalent CSO controls (i.e., where two CSO controls provide identical pollution, CSO frequency, and CSO volume control benefits, CRW may evaluate the lower cost or more feasible option).

i.  For each feasible  CSO control technology identified pursuant to Paragraph 22(a), CRW shall evaluate:

1.  the size of each CSO control technology necessary to reduce the number of untreated CSO Events in a Typical Year on an annual basis to the following frequencies: 0, 1-2, 3-4, 5-6, 7-8, 9-10;

2.   a determination, expressed in present value, consistent, year-specific

dollars, the estimated capital costs and annual O&M costs used to determine the total "project

costs," as that term is described in Section 3.4.1 of EPA's "Guidance for Long Term control

Plans" (August 1995);

3.   a "knee of the curve" cost-performance analysis for each CSO control

technology that will allow for the comparison of the costs to:

(i)  the reduction in volume of the CSOs;

(ii)  the reduction in CSO Events; and

(iii) the reduction in pollutant of concern loading from CSOs.

4.   For CSO controls applied to CSOs that discharge to Receiving Waters

for which the Demonstration Approach was determined to be appropriate under Paragraph 16,

CRW shall utilize its calibrated H&H Model and Water Quality Model to assess the impact of

each size of those controls, pursuant to Paragraph 22(b)(i)(1), on compliance with water quality

standards within the Typical Year.  Where background sources currently prevent compliance

with the water quality standards, CRW shall also assess the impact of each size of the CSO

controls assuming background pollutant levels reduced such that in-stream concentrations

upstream of the CSO Outfalls are seventy-five (75) percent of the applicable water quality

standard.

5.   For CSO controls applied to CSOs that discharge to Receiving

Waters for which the Presumption Approach was determined to be appropriate, CRW shall

utilize its calibrated H&H Model to determine the physical sizes and capacities of each CSO

control needed to evaluate the range of sizes required by Paragraph 22(b)(i)(1).

c. <u>Green Infrastructure</u>. CRW shall consider Green Infrastructure ("GI") alternatives as part of the combined sewer system control alternatives under the LTCP. The LTCP shall contain the following minimum considerations for proposing a GI alternative to traditional controls:

i. <u>Identification of potential locations for GI</u>: CRW shall specifically identify potential areas within the Combined Sewer System that would be suitable for development of a GI control measure. Each potential area shall be prioritized using considerations such as life-cycle cost (including cost of long-term operation and maintenance), the ability to develop effective GI control measures, availability of land, CSO control levels achieved, environmental and socio-economic benefits and impacts, and benefits and impacts to minority and low income neighborhoods.

ii. <u>Applicability and Performance Assessment</u>. Any GI control measures proposed shall include an applicability and performance assessment that includes consideration of unique sewershed-specific features such as diversion structures/outfalls, receiving waters, and land uses. Information and data gathered from other existing GI control measure studies and/or projects can inform, to the extent appropriate, applicability and performance assessments required under this Paragraph.

iii. For any GI controls to be sited on private property, or operated by an entity other than CRW, CRW shall provide a discussion of how CRW will ensure the continual operation and maintenance of such controls.

23. In analyzing the selection of CSO Controls, the LTCP shall include an analysis of the LTCP's impact on environmental justice populations.

24. The revised and updated LTCP shall include, at a minimum, the following elements:

a. The detailed results of all characterization, monitoring, and modeling activities performed in accordance with Paragraphs 15 through 21, as the basis for selection and design of effective CSO controls; including a statistical determination of an appropriate "Typical Year";

b. A summary of the public participation process that actively involved the public in the decision-making to select long-term CSO controls;

c. Identification of how the LTCP addresses Sensitive Areas as the highest priority for controlling overflows;

d. A detailed description of the evaluation and consideration of alternatives, and presentation of the results of those evaluations;

e. The findings of the alternative development, evaluation, and selection process performed in accordance with Paragraph 22;

f. A description of the type, location, and size of CSO Control Alternatives;

g. Demonstration that the selected alternatives will result in any remaining CSOs not causing or contributing to exceedances of water quality standards, for any Receiving Water where the Demonstration approach to LTCP Alternative Evaluation was selected under Paragraph 16;

h. Maximization of treatment at the AWTF for wet weather flows, and for any bypassing, include a No Feasible Alternative Analysis, in accordance with CSO Policy Section II.C.7;

i. An expeditious schedule for implementation of the proposed CSO controls that is consistent with the findings of the Financial Capability Analysis required by Paragraph 18; and

j. A post-construction compliance monitoring program adequate to ascertain the effectiveness of CSO controls and to verify compliance of CRW's CSOs with water quality-based CWA requirements, and consistent with the "CSO Post Construction Compliance Monitoring Guidance" (May 2012), EPA-833-K-11-001.

25. Any proposal for significant modification of the LTCP development schedule or the content of any of the major deliverables associated with development of the LTCP set forth in this Consent Decree shall follow the procedures set forth below in the Section XIX (Modification).

26. After approval of the LTCP, and associated schedules, by Plaintiffs pursuant to Section VI (Review and Approval of Deliverables), the approved LTCP shall be incorporated into and shall be an enforceable part of either a modification of this Consent Decree, or a second consent decree, which will address implementation of the revised and updated LTCP, and any necessary related measures.

## F.  SEPARATE SANITARY SEWER COMPLIANCE

27. <u>Elimination of Sanitary Sewer Overflows</u>.  All SSOs are prohibited.

28. CRW shall report all occurrences of SSOs to PADEP by telephone at 866-825-0208 immediately, but no later than four (4) hours after CRW becomes aware of the SSO, and shall also report in writing to EPA and PADEP all SSOs within five (5) Days of when CRW becomes aware of the SSO.  Written reports of SSOs shall include, at a minimum: (1) the location of the SSO, (2) the date and time the SSO was discovered, (3) a description of the cause(s) of the SSO and corrective action(s) taken to resolve the SSO, (4) the date and time the

SSO was resolved, and (5) the estimated volume of the SSO. Upon notification or discovery of the SSO event, CRW shall immediately take the steps necessary to prevent pollution, or a danger of pollution, from a SSO event.

29.     CRW shall satisfy the compliance requirements of the following referenced Paragraphs of this Consent Decree in the operation and maintenance of its Separate Sanitary Sewer System:

        a.     The OMM prepared and implemented under Paragraph 11(a) shall address the operation and maintenance of the Separate Sanitary Sewer System;

        b.     The H&H Model refined and calibrated under Paragraph 15 shall include those portions of CRW's Conveyance System receiving flow from the Separate Sanitary Sewer System, as well as any portions of the Separate Sanitary Sewer System necessary to include locations that have experienced chronic capacity-related SSOs;

        c.     The H&H Model shall also accurately characterize the dry and wet weather flows from the Separate Sanitary System.

        d.     The LTCP developed under Paragraph 14 shall address those portions of the Conveyance System receiving flow from the Separate Sanitary Sewer System.

30.     Separate Sanitary Sewer System Capacity Assessment.

        a.     CRW shall submit a Capacity Assessment Plan to Plaintiffs for review and comment pursuant to Section VI (Review and Approval of Deliverables) within 12 months of the Date of Lodging. The Capacity Assessment Plan shall describe how CRW will carry out an engineering assessment that satisfies the requirements described below in Paragraph 30(b), and shall include a schedule for the completion of that assessment, and the development of a report that summarized the result of that assessment, by April 1, 2017.

b.    Implementation of the Capacity Assessment Plan.

i.  CRW shall carry out an assessment of the capacity of the Separate Sanitary Sewer System according to the Capacity Assessment Plan prepared under Paragraph 30(a).  The assessment will identify locations within the Separate Sanitary Sewer System that have experienced SSOs and are forecast through hydraulic modeling to experience SSOs during the specific storm events listed below.  CRW's assessment shall include:

1.    The Spring Creek and Asylum Run Interceptors;

2.    All pump stations and force mains;

3.    All sanitary gravity sewers upstream of the interceptors eighteen (18) inches in diameter or greater; and

4.    An additional ten (10) percent of the sanitary gravity sewers for model continuity and/or that hydraulically impact known chronic SSOs;

ii.  This assessment shall consider the capacity of the Separate Sanitary Sewer System under current conditions, during the following events:

1.  Typical peak dry weather conditions;

2.  2 Year, 24-Hour Storm event;

3.  5-Year, 24-Hour Storm event;

4.  10-Year, 24-Hour Storm event.

iii.  The assessment shall identify locations expected to experience SSOs, during the conditions specified in Paragraph 30(b)(ii), above.

iv.  The assessment shall consider the current actual firm capacity of CRW's pump stations, and the ability of those pump stations to pump the flows forecast for typical peak

dry weather flow rates and the peak flow rates associated with the rainfall events specified in Paragraph 30(b)(ii), above.

     v.  In support of this assessment, CRW shall:

     1.     Complete inspections of the interior of the Spring Creek and Asylum Run Interceptors as required by Paragraph 11(a)(iii);

     2.     Conduct sufficient flow monitoring in addition to the monitoring defined in Section 14, as defined in the Capacity Assessment Plan, to allow adequate development, calibration, and validation of all such portions of the Separate Sanitary Sewer System listed in Paragraph 30(b)(i) included in the H&H Model developed pursuant to the IFMMPP.

     c.   <u>Capacity Assessment</u>.  CRW shall implement the approved Capacity Assessment Plan in accordance with the schedule provided therein, concluding by April 1, 2017.

     i.  At the completion of Capacity Assessment, CRW shall submit a Capacity Assessment Report, consistent with the schedule in the approved Capacity Assessment Plan required by Paragraph 30(b), which presents and summarizes the results of the implementation of the Capacity Assessment Plan.  The Capacity Assessment Report shall demonstrate that the assessment has been carried out in accordance with the approved Capacity Assessment Plan, shall describe the analyses carried out, and shall identify, using both narrative and appropriate sewer maps, the lengths of sewer and locations within the designated portions of the Separate Sanitary Sewer System that have actually experienced SSOs, and those that through modeling conditions experience Surcharge Conditions or SSOs during each flow condition specified in Paragraph 30(b)(ii).

ii.  By April 1, 2017, CRW shall also submit as part of the Capacity

Assessment Report a description of remedial measures necessary to address all of the actual and

predicted capacity constraints identified by the Capacity Assessment, estimates of the capital costs

of each such remedial measure, and a priority-based schedule for completion of the remedial work

necessary to address identified capacity constraints in the Separate Sanitary Sewer System.

## G.  ONGOING CONSTRUCTION / EARLY ACTION PROJECTS

31.  CRW shall complete the following projects within the timeframes set forth below:

a.  <u>High Priority Combined Sewer Interceptor Improvements</u>.  CRW shall

perform a comprehensive assessment of the structural integrity of the Front Street Interceptor by

October 31, 2014.  Based on the findings of the assessment, CRW shall identify all priority

remedial work in the Front Street Interceptor and develop a construction schedule to submit to

Plaintiffs for review and approval pursuant to Section VI (Review and Approval of Deliverables)

by March 1, 2015.  All priority remedial work under the construction schedule proposed is to be

completed by July 1, 2019.  For the purposes of this Paragraph, priority remedial work shall

include, but not be limited to, all Front Street Interceptor segments that, based on an engineering

assessment of internal inspection data, receive a pipe segment index score of "5" or "4" using the

National Association of Sewer Service Companies ("NASSCO") Pipeline Assessment

Certification Program and Manhole Assessment Certification Program.  Progress on all priority

remedial work conducted pursuant to this Paragraph shall be reported in the Semi-Annual

Reports pursuant to Section VII (Reporting Requirements).

b.  <u>Sinkhole Repair</u>.  CRW shall investigate all sinkholes reported as of the

Date of Lodging of this Consent Decree and shall remediate those sinkholes caused by the

structural deterioration of the Collection or Conveyance Systems, including laterals, within three

(3) years of the Date of Lodging.  CRW shall: (1) provide Plaintiffs a list of all sinkholes

reported as of the Date of Lodging, (2) conduct an investigation of each such sinkhole to identify those sinkholes caused by the structural deterioration of the Collection or Conveyance Systems, including laterals, (3) determine the remediation work necessary to repair those sinkholes and their underlying causes, and (4) define a schedule under which all remediation work will be completed within three (3) years of the Date of Lodging.

c. <u>CSO Outfall Repair.</u> Within one (1) year of the Date of Lodging of this Consent Decree CRW shall investigate each CSO outfall structure for defects, define all priority remedial work necessary for CSO outfall repairs, and develop a schedule for completion of the priority remedial work. The investigation shall include, at a minimum, a surface evaluation of the outfall pipe from the regulator chamber to the outfall, the condition of the outfall and the condition and effectiveness of any intrusion gates and duck bill flaps. CRW shall perform all priority remedial work to address identified defects that would lead to intrusion into the CSS or leaks of combined sewage that may occur between the regulator chamber and designated outfall that are causing the erosion of soil into the receiving water or pose a threat to human health via increased risk of exposure.

d. <u>CSO Monitoring Activation Pilot Study.</u> Within three (3) months of the Date of Lodging, CRW shall develop and submit to EPA and PADEP for review and approval, pursuant to Section VI of the Consent Decree (Review and Approval of Deliverables), a CSO Activation Monitoring Pilot Study ("CAMP Study") Plan. The CAMP Study shall include the installation and operation of selected telemetered CSO activation monitoring technologies in four (4) of CRW's CSOs for a period of at least twelve (12) months, during which CRW shall continue to monitor the selected CSOs manually, as required pursuant to Paragraph 11(g). At a minimum, the CAMP Study Plan shall evaluate the feasibility of piloting the following

technologies: Urbanalta Technologies (video-based technology); Radio Data Networks (BMT UK technology); Ultrasonic/float switch combination technology; and a CSO activation monitoring technology of CRW's choosing.

      i.  The CAMP Study shall evaluate the efficacy of the selected technologies in providing remote real-time information regarding regulator status, and in allowing CRW to more reliably detect DWOs. As part of the CAMP Study, CRW shall review the data collected by each technology for quality, including comparison to manually collected activation observations, and shall characterize the data's reliability and accuracy.

      ii.  The CAMP Study Plan shall identify the technologies to be piloted and the CSOs selected for installation of the technologies. If the technologies identified in Paragraph 31(d) are determined not to be feasible, the CAMP Study Plan shall identify an equivalent number of alternative monitoring technologies to be piloted. The Plan shall also set forth a schedule for completion of the CAMP Study and submission of the CAMP Study Report, to include the results of the CAMP Study, by December 1, 2016.

      iii.  Once the CAMP Study Plan is approved, CRW shall implement the recommendations of the approved CAMP Study Plan.

## H.    GENERAL COMPLIANCE

32.    <u>Effluent Limits for AWTF</u>.

a.    CRW shall comply with all final effluent limits, including final nutrient effluent limits, set forth in the NPDES Permit.

b.    The requirements set forth in Paragraph 3 of the Consent Order and Agreement between CRW and PADEP entered into on June 5, 2013 and amended on March 4, 2014 regarding the compliance schedule for BNR project construction at the AWTF are hereby superseded and replaced by the following compliance schedule:

i.   Issue notice to proceed for the construction of AWTF upgrades in accordance with WGM Part II Permit No. 221403 by February 15, 2014 [completed];

ii.   Submit Construction Progress Reports to Plaintiffs, due quarterly from the date construction commences;

iii.   Complete all construction operations identified in WQM Part II Permit No. 2212403 by February 15, 2016.

c.   If, on October 1, 2014, CRW is not in compliance with the annual effluent limitations for nutrients set forth in the NPDES Permit for the compliance period ending on September 30, 2014, they shall, on or before November 28, 2014, purchase a minimum of 116,000 of Total Nitrogen credits, up to the amount of $350,000.00.  CRW shall use reasonable diligence in obtaining the best value for any money spent purchasing nutrient credits.  Any savings from funds CRW budgeted towards the purchase of nutrient credits per the requirements of its NPDES Permit shall be directed toward compliance with the injunctive relief requirements set forth in Section V (Compliance Measures) of this Consent Decree.

33.   <u>Dry Weather Overflows</u>.

a.   All Dry Weather Overflows from the Combined Sewer System are prohibited.

b.   CRW must report all Dry Weather Overflows to PADEP by telephone at 866-825-0208 immediately, but no later than four (4) hours after CRW becomes aware of the Dry Weather Overflow, and must provide written notification to PADEP with five (5) Days of when CRW becomes aware of the Dry Weather Overflow.  All DWOs shall be reported to EPA in the monthly Discharge Monitoring Reports ("DMRs").

c.     Should CRW detect a Dry Weather Overflow, CRW shall begin corrective action upon notification or discovery of the Overflow immediately.  CRW shall inspect the outfall(s) from which the Dry Weather Overflow occurred each subsequent day until the overflow has been eliminated.

d.     CRW shall summarize all such Dry Weather Overflows in the Semi-Annual Report required under Section VII (Reporting Requirements).  Nothing in this Section shall eliminate or minimize any additional notification or reporting required by the NPDES Permit.

34.     _Unauthorized Releases_.  All Unauthorized Releases from the Combined Sewer System are prohibited.

35.     CRW shall report all occurrences of Unauthorized Releases to PADEP by telephone at 866-825-0208 immediately, but no later than four (4) hours after CRW becomes aware of the Unauthorized Release, and shall also report in writing to EPA and PADEP all Unauthorized Releases within five (5) Days of when CRW becomes aware of the Unauthorized Releases.  Written reports of Unauthorized Releases shall include, at a minimum: (1) the location of the Unauthorized Release, (2) the date and time the Unauthorized Release was discovered, (3) a description of the cause(s) of the Unauthorized Release and corrective action(s) taken to resolve the Unauthorized Release, (4) the date and time the Unauthorized Release was resolved, and (5) the estimated volume of the Unauthorized Release.  CRW shall immediately take the steps necessary to prevent pollution, or a danger of pollution, from an Unauthorized Release event upon notification or discovery of the Release.

36.     _Reporting Planned Changes and Non-Compliance_.

a. CRW shall comply with the provisions of the NPDES Permit requiring the reporting of anticipated and unanticipated non-compliance with the NPDES Permit, which, as of the Effective Date, are described in Part A, § III.C. of the NPDES Permit.

b. Whenever written notice of non-compliance is required to be given to the PADEP pursuant to the NPDES Permit, CRW shall simultaneously notify the EPA in accordance with Section XVI (Notices and Submissions).

## VI. REVIEW AND APPROVAL OF DELIVERABLES

37. For each plan, report, schedule or other document required to be submitted for review and approval pursuant to this Consent Decree and its attachments, EPA, after consultation with PADEP, may provide a response as listed in Paragraph 37(a)(i)-(iv).

a. Plaintiffs shall respond in writing as expeditiously as practicable in one of the following ways:

    i. Approve the submission;

    ii. Approve the submission upon specified conditions;

    iii. Approve part of the submission and disapprove the remainder, or

    iv. Disapprove the submission.

b. Approved Submissions. If the submission is approved pursuant to Paragraph 37(a)(i), CRW shall take all actions required by the plan, report, schedule, or other document, in accordance with the schedules and requirements of the plan, report, schedule, or other document, as approved.

c. Conditionally or Partially Approved Submissions. If the submission is conditionally approved or approved only in part, pursuant to Paragraph 37(a)(ii) or (iii), CRW shall, upon written direction from Plaintiffs, take all actions required by the approved plan,

report, schedule, or other item that Plaintiffs determine are severable from any disapproved portions, under Section XII of this Decree (Dispute Resolution).

       d.     If the submission is disapproved in whole or in part pursuant to Paragraph 37(a)(iii) or (iv), CRW shall, within forty-five (45) Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, CRW shall proceed in accordance with the preceding Paragraph.

       e.     Any stipulated penalties applicable to the original submission, as provided in Section X (Stipulated Penalties) of this Decree, shall accrue during the 45-Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of CRW's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

       f.     <u>Partially or Completely Disapproved Resubmittal.</u>  If a resubmitted plan, report, schedule, or other item, or portion thereof, is disapproved in whole or in part, Plaintiffs

       i.  May require CRW to correct any deficiencies, in accordance with the preceding Paragraphs, or

       ii.  May themselves correct any deficiencies and CRW must implement the corrected submission, subject to CRW's rights to invoke Dispute Resolution and the right of Plaintiffs to seek stipulated penalties as provided in this Consent Decree.

     38.    <u>Requests for Extension of Affected Deadlines.</u>  If CRW timely submits or resubmits an item for review and approval or for comment under this Consent Decree, and EPA and/or PADEP provides formal response to the submission or resubmission more than sixty (60)

Days after the date the deliverable item was submitted or resubmitted, then CRW may request an extension of any affected deadline(s), provided that CRW demonstrates that it will be unable to meet the deadline(s) as a result of the length of EPA's and/or PADEP's review process. CRW shall provide written notice to Plaintiffs of its need for an extension of the deadline(s), and indicate in the notice the amount of time requested for the extension. The amount of time requested for the extension of any deadline(s) shall not exceed the number of Days in excess of sixty (60) that elapsed between: (i) the date that Plaintiffs received the submittal or modified submittal; and (ii) the date that EPA took action under Paragraph 37. Such extension will not be effective unless EPA grants it in writing. CRW may invoke dispute resolution under Section XII (Dispute Resolution) with respect to any disputes under this Paragraph. This Paragraph applies to all deliverables under this Consent Decree with the exception of the following: the NMC Plan submitted pursuant to Paragraph 11 and the Long Term Control Plan submitted pursuant to Paragraph 14.

39.     All plans and studies submitted pursuant to this Consent Decree shall be incorporated herein as part of this Consent Decree upon approval by Plaintiffs.

40.     CRW shall take all lawful and appropriate actions to facilitate the implementation of this Consent Decree, including prompt review and approval of any appropriate and responsive bids, contracts, or other documents, and, if applicable, prompt review and approval of any appropriate schedule of work necessary to maintain compliance with this Consent Decree.

41.     For each plan, report, schedule or other document required to be submitted for review and comment pursuant to this Consent Decree and its attachments, EPA, after consultation with PADEP, may choose to provide written comments on the deliverable. If EPA, after consultation with PADEP, provides comments that identify deficiencies in such a

deliverable, and EPA requests a response from CRW, then CRW shall provide a written response to EPA within thirty (30) Days of receipt of such request.

      a.     <u>Stipulated Penalties Accruing</u>.  If CRW fails to substantively address EPA comments for which EPA requests a response from CRW, such failure is subject to Stipulated Penalties as provided in Section X.

**VII.  REPORTING REQUIREMENTS**

**A.  REPORTS**

      42.     CRW will provide to EPA copies of all written notifications and reports that CRW is required to submit to PADEP relevant to this Consent Decree.

      43.     <u>Semi-Annual Reports</u>.  On a semi-annual basis of each calendar year and commencing on the first quarter after the Effective Date of this Consent Decree and continuing until termination of this Consent Decree pursuant to Section XX (Termination), CRW shall submit to Plaintiffs written status reports on their progress in implementing the Consent Decree ("Semi-Annual Reports").  The Chapter 94 Annual Report required pursuant to CRW's NPDES Permit shall constitute one of the Semi-Annual Reports required pursuant to this Section, shall be postmarked no later than March 31, and shall cover compliance activities for the six (6) month period ending on the previous December 31.  The second Semi-Annual Reports shall be postmarked no later than September 30 and shall cover compliance activities for the six (6) month period ending on the previous June 30.  The Semi-Annual Reports shall be addressed and submitted to the following:

Program Manager, Clean Water Program
Department of Environmental Protection
South Central Regional Office
909 Elmerton Avenue
Harrisburg, PA  17110-8200

and

NPDES Enforcement Branch, 3WP42
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA  19103

A sample format for the Semi-Annual Report is attached as Appendix A.  The Semi-Annual Report will include at a minimum:

a.    A statement setting forth the deadlines and other terms that CRW was required by this Consent Decree to meet since the date of the last Semi-Annual Report, whether and to what extent CRW met these requirements, and the reasons for any noncompliance;

b.    A description of the projects, work, and activities completed during the prior six-month period, and a projection of the projects, work, and activities to be performed pursuant to this Consent Decree during the next or succeeding six-month period;

c.    A summary of all the problems or potential problems encountered during the prior six-month period, and the actions taken to rectify the problems;

d.    A summary of all contacts with Plaintiffs during the reporting period relating to CSOs, SSOs, or implementation of AWTF upgrades;

e.    A record of all CSO discharges that took place during the reporting period, including:

i.    The date and approximate time and duration of each CSO discharge;

ii.    The volume and nature of each CSO discharge;

iii.    The influent and effluent flow rate at the AWTF at the time of the CSO discharge;

iv.    Precipitation events that occurred before and during the CSO discharge, including the date and time that the precipitation began and ended;

f.     Information regarding each instance of Secondary Bypass at the AWTF, including:

i.   The date of each bypass;

ii.  The amount of rainfall, and if not weather-related, the cause of the bypass;

iii. Estimated duration and total volume of bypass;

iv.  Minimum, maximum, and average flow through complete treatment during bypass;

v.   Date and estimated time the bypass started and ended.

g.     A statement of any exceedances of NPDES permit limitations;

h.     Disclosure of any non-compliance with the requirements of this Consent Decree, including:

i.   An explanation of the likely cause of the non-compliance, or, if the likely cause of the non-compliance cannot be determined at the time the Semi-Annual Report is due, an explanation as to why the likely cause cannot be determined at that time;

ii.  A description of the remedial steps taken, or to be taken, to prevent or minimize such non-compliance in the future, and;

iii. A projection of work to be performed pursuant to this Consent Decree during the next or succeeding six-month period.  Notification to Plaintiffs of any anticipated delay shall not, by itself, excuse the delay.

i.     <u>Semi-Annual Meetings</u>.  As necessary, the Parties shall meet at least semi-annually, approximately one (1) month following CRW's submission of its Semi-Annual Report and Chapter 94 Report, to review and discuss the reports, progress made during the previous six

(6) month period, the results of any ongoing work and analyses, and compliance with the requirements of the Consent Decree.  Any party may request that additional meetings be held.

44.  <u>Reports of an Immediate Threat</u>.  Whenever any event occurs which may pose an imminent threat to the public health or welfare or the environment, CRW shall notify Plaintiffs orally and by electronic or facsimile transmission immediately, but no later than four (4) hours after CRW first became aware of the event, at: 866-825-0208.  This reporting requirement is in addition to the requirements set forth in the preceding Paragraph.

**B.   CERTIFICATION AND ADMISSIBILITY**

45.  Any report or plan, or any representation made by CRW as to compliance with this Consent Decree that CRW is required by this Consent Decree to submit shall be signed by an official or authorized agent of CRW and shall include the following certification:

> "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gathered and evaluated the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

46.  The reporting requirements of this Consent Decree do not relieve CRW of any reporting obligations required by the CWA or implementing regulations, or by any other Federal, Commonwealth, or local law, regulation, permit, or other requirement.

47.     Any information provided pursuant to this Consent Decree may be used by the United States or PADEP in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

48.     CRW shall not object to the authenticity of any report, plan, or other submission prepared in accordance with Section V (Compliance Measures), or the information contained in said report, plan or submission in any proceeding to enforce this Consent Decree.

49.     Nothing in this Section relieves CRW of the obligation to provide the notice required by Section XI of this Consent Decree (Force Majeure).

## VIII.   FUNDING

50.     Compliance with the terms of this Consent Decree by CRW is not conditioned on the receipt of federal or state grant or loan funds or upon CRW's financial capabilities.  In addition, CRW's failure to comply is not excused by the lack of federal or state grant or loan funds, or by the processing of any applications for the same, or by CRW's financial capabilities.

## IX.     CIVIL PENALTIES

51.     <u>Civil Penalty Payable by CRW</u>.  The United States and PADEP shall defer assessment of all civil penalties for CRW's violations of the Clean Water Act and Clean Streams Law, as alleged in the Complaint, until such time as Plaintiffs have approved CRW's updated LTCP and this Consent Decree is submitted for modification, or a second decree negotiated, to address implementation of the updated LTCP and any necessary related measures, pursuant to Paragraph 26 of this Consent Decree.

## X.      STIPULATED PENALTIES

52.     <u>Liability for Stipulated Penalties</u>.  Defendants shall be liable to the United States and PADEP for violations of this Consent Decree as specified below, unless excused under Section XI (Force Majeure).  A violation includes failing to perform any obligation required by

the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

53.     <u>Reporting Requirements</u>. For each failure to submit a timely and adequate plan, report, schedule, written notice, or other deliverable required by this Decree, CRW shall pay the following stipulated penalties to Plaintiffs per violation per Day, for each Day it fails to submit the required deliverable, or to make any required material changes to such deliverable(s) within the required timeframe:

| Period of Noncompliance | Penalty per Day per Violation |
| --- | --- |
| Days 1-30 | $500 |
| Days 31-60 | $750 |
| Days 61-90 | $1,000 |
| Days 91 and over | $1,500 |

54.     <u>Compliance Milestones</u>.

a.      For each failure to comply with a requirement of, or meet a deadline in, the NMC Plan pursuant to Paragraph 11 (Nine Minimum Controls), Paragraph 13 (Minimum Control Measures), Paragraphs 14-24 (Long-Term Control Plan), CRW shall pay the following stipulated penalties to Plaintiffs per violation per Day:

| Period of Noncompliance | Penalty per Day per Violation |
| --- | --- |
| Days 1-30 | $500 |
| Days 31-60 | $750 |
| Days 61-90 | $1,000 |
| Days 91 and over | $2,000 |

b.      For each failure to comply with a requirement of, or meet a deadline in, Paragraph 31 [Ongoing Construction / Early Action Projects], CRW shall pay the following stipulated penalties to Plaintiffs per violation per Day:

| Period of Noncompliance | Penalty per Day per Violation |
| --- | --- |
| Days 1-30 | $750 |

| | |
|---|---|
| Days 31-60 | $1,000 |
| Days 61-90 | $1,500 |
| Days 91 and over | $3,000 |

        c.        For each failure to comply with a requirement of, or meet a deadline in,

Paragraph 32(b) [BNR Project Construction], CRW shall pay the following stipulated penalties

to Plaintiffs per violation per Day:

| Period of Noncompliance | Penalty per Day per Violation |
|---|---|
| Days 1-30 | $1,000 |
| Days 31-60 | $1,500 |
| Days 61-90 | $2,000 |
| Days 91 and over | $4,000 |

      55.     General Compliance.

        a.        For each discharge in violation of Paragraph 33(a) [Dry Weather

Overflows], or for each discharge in violation of Paragraph 27 [Sanitary Sewer Overflows], or

for each discharge in violation of Paragraph 34 [Unauthorized Releases], CRW shall pay to

Plaintiffs the following stipulated penalties:

| DWO or SSO or Unauthorized Release volume: | The penalty shall be: |
|---|---|
| Less than or equal to 10,000 gallons: | $500 |
| Greater than or equal to 10,000 gallons, but less than or equal to 250,000 gallons: | |
|     (1) Within 2 years of Effective Date | $500 |
|     (2) Between 2 years and 5 years from         Effective Date | $1,000 |
|     (3) More than 5 years from Effective         Date | $2,000 |
| Greater than 250,000 gallons, but less than or equal to 1,000,000 gallons: | |
|     (1) Within 2 years of Effective Date | $1,000 |

| | |
|---|---|
| (2) Between 2 years and 5 years from Effective Date | $2,500 |
| (3) More than 5 years from Effective Date | $5,000 |

Greater than 1,000,000 gallons:

| | |
|---|---|
| (1) Within 2 years of Effective Date | $2,000 |
| (2) Between 2 years and 5 years from Effective Date | $5,000 |
| (3) More than 5 years from Effective Date | $10,000 |

 

b.      For each failure to comply with Paragraph 32(a) [Effluent Limits] CRW shall pay the following stipulated penalties to Plaintiffs per violation of permit conditions:

| Type of Permit Limit: | Penalty per violation: |
|---|---|
| Daily or Instantaneous | $500 |
| Weekly | $1,500 |
| Monthly | $3,000 |

 

c.      For failure to comply with Paragraph 32(c), CRW shall pay to the Plaintiffs a stipulated penalty equal to the difference between $350,000.00 and the amount paid for Total Nitrogen credits. The unavailability of credits is not a defense to liability for penalties under this Subparagraph.

56.    <u>Noncompliance with all other Provisions of the Consent Decree</u>. Stipulated penalties shall accrue for each Day of noncompliance with any requirement not otherwise provided for by the Stipulated Penalty Provisions in Paragraph 52 through Paragraph 55 as follows:

| Period of Noncompliance | Penalty per Day per Violation |
|---|---|
| Days 1-30 | $200 |
| Days 31-60 | $300 |
| Days 61-90 | $500 |

Days 91 and over                                        $700

57.     <u>Accrual of Stipulated Penalties</u>.  Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

58.     Subject to Defendants' rights to invoke dispute resolution pursuant to Section XII (Dispute Resolution), Defendants shall pay stipulated penalties to the United States and PADEP within thirty (30) Days of a written demand by either Plaintiff as follows:

a.     Defendants shall pay to the United States fifty percent (50%) of the total stipulated penalty amount due by submitting a cashier's or certified check payable to "U.S. Department of Justice" and will reference DOJ Case Number 90-5-1-1-10157, and the civil action case number and case name of this action assigned to this matter by the United States District court for the Middle District of Pennsylvania.  Checks will be tendered to the United States Attorney's Office, Financial Litigation Unit, Harrisburg Federal Building and Courthouse, 228 Walnut Street, Suite 220, P.O. Box 11754, Harrisburg, PA  17108-1754, and will be accompanied by a letter specifying the specific stipulated penalty provision involved, and a description of the violation(s) of this Consent Decree for which the stipulated penalties are being tendered.  Defendants shall send a copy of both the check and the transmittal letter to:

Docket Clerk (3RC00)
U.S. EPA Region III
1650 Arch Street
Philadelphia, PA  19103-2020

Regional Counsel (3RC00)
U.S. EPA Region III

1650 Arch Street
Philadelphia, PA  19103-2029

and to

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044
DOJ# 90-5-1-1-10157

b.      Defendants shall pay to PADEP fifty percent (50%) of the stipulated penalty amount due by submitting a corporate check or the like made payable to "Commonwealth of Pennsylvania, Clean Water Fund" to the Program Manager, Clean Water Program, Department of Environmental Protection, South-central Regional Office, 909 Elmerton Ave., Harrisburg, Pennsylvania  17110.  A transmittal letter shall accompany the check, and the latter shall state that the payment is for stipulated penalties owed pursuant to the Consent Decree in <u>United States and Commonwealth of Pennsylvania Department of Environmental Protection v. The City of Harrisburg and Capital Region Water</u> and shall reference the civil action number. The transmittal letter shall also specify the violation(s) for which the penalties are being paid.

c.      <u>Interest</u>.  If Defendants fail to tender all or any portion of the stipulated penalty amount due as required by this Paragraph, interest on the unpaid amount shall accrue in accordance with the provisions of 28 U.S.C. § 1961 and Defendants shall pay such interest from the date that a payment is due until the full amount owed is paid.

59.      <u>Discretion to Reduce or Waive Stipulated Penalties</u>.  Either EPA or PADEP may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.  If one Plaintiff reduces or waives stipulated penalties, the Plaintiff not offering a waiver or reduction retains its authority to require payment of stipulated penalties.

60. <u>Penalty Accrual During Dispute Resolution</u>. Stipulated penalties shall continue to accrue as provided in this Section during any dispute resolution, with interest calculated as provided in Paragraph 58(c) [Interest], but need not be paid until the following:

     a.     If the dispute is resolved by agreement of the Parties; or

     b.     If the dispute is resolved by a decision by EPA and/or PADEP that is not appealed to the United States District Court for the Middle District of Pennsylvania, Defendants shall pay accrued penalties, together with interest, to Plaintiffs within thirty (30) Days of the effective date of the agreement or within thirty (30) Days of Defendants' receipt of the decision or order.

     c.     If the dispute is appealed to the Court and the United States and/or PADEP prevails in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph (d), below.

     d.     If any Party appeals the District Court's decision, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

61. If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in Paragraph 58(c) [Interest], accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or PADEP from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

62. Subject to the provisions of Section XIII (Effect of Settlement), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or

sanctions available to the United States or PADEP for Defendants' violation of this Consent Decree or applicable law. Where a violation of this Consent Decree is also a violation of the Clean Water Act, 33 U.S.C. §§ 1251-1387, or the Pennsylvania Clean Streams Law, 35 Pa. Stat. Ann. §§ 691.1-691.1001, Defendants shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

## XI.    FORCE MAJEURE

63.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' consultants or contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event as it is occurring, and after it has occurred, to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree. Unanticipated or increased costs or expenses associated with implementation of this Consent Decree and/or changed financial circumstances will not, in any event, be considered Force Majeure events. Application for construction grants, State Revolving Loan Funds, or any other grants or loans, or delays caused by inadequate facility planning or plans on the part of Defendants do not constitute Force Majeure events.

64.    Where any compliance obligation in Section V (Compliance Measures) requires CRW to obtain a federal, state, or local permit or approval, CRW shall submit timely and complete application sand take all other actions necessary to obtain all such permits or approvals. CRW may seek relief under this Section for any delay in the performance of any such obligation

resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if CRW has submitted time and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

65.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice to Plaintiffs orally or by electronic or facsimile transmission within 72 hours of when Defendants first knew that the event might cause a delay.  Within seven (7) days thereafter Defendants shall provide in writing to Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if assertion of such a claim is intended; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a Force Majeure event.  Failure to comply with the above requirement shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.

66.     Defendants shall be deemed to know of any circumstance of which Defendants, or any entity controlled by Defendants, including Defendants' consultants and contractors, knew or should have known.

67.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are

affected by the Force Majeure event will be extended by Plaintiffs, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, in any, for performance of the obligations affected by the Force Majeure event.

68.     If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

69.     If Defendants elect to invoke the dispute resolution procedures set forth in Section XII (Dispute Resolution), they shall do so no later than fifteen (15) days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 65 and 66.

70.     Nothing in this Section relieves Defendants of their duty to use due diligence to timely complete the requirements of this Consent Decree or of CRW's obligation to meet all discharge limitations and other obligations contained in its NPDES permit.

71.     Compliance with a requirement of this Consent Decree shall not by itself constitute compliance with any other requirement. An extension of one compliance date based on a particular event will not automatically extend any other compliance date or dates. Defendants will make an individual showing of proof regarding the cause of each delayed

incremental step or other requirement for which an extension is sought. Defendants may petition for the extension of more than one compliance date in a single request.

## XII.   DISPUTE RESOLUTION

72.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by the United States or PADEP to enforce any obligation of Defendants arising under this Decree.

73.     <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the United States and PADEP a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States, in consultation with PADEP, shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, Defendants invoke formal dispute resolution procedures as set forth below.

74.     <u>Formal Dispute Resolution</u>. Defendants shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and PADEP a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

75. The United States, in consultation with PADEP, shall serve its Statement of Position within thirty (30) Days of receipt of Defendant's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Defendants unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

76. Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States and PADEP, in accordance with Section XVI of this Consent Decree (Notices and Submissions), a motion requesting judicial resolution of the dispute. The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

77. The United States, in consultation with PADEP, shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court. Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

78. <u>Standard of Review</u>.

    a. <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 74 [Formal Dispute Resolution] pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent

Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendants shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b. _Other Disputes_. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 74 [Formal Dispute Resolution], Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of this Consent Decree, and that Defendants are entitled to relief under applicable law.

79. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 60 [Penalty Accrual During Dispute Resolution]. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (Stipulated Penalties).

## XIII. EFFECT OF SETTLEMENT

80. _Resolution of Claims_. This Consent Decree resolves the civil claims of the United States and PADEP for the violations alleged against CRW in the Plaintiffs' Complaint through the Date of Lodging of this Consent Decree, except that the Parties specifically acknowledge and agree that this Consent Decree does not resolve any claims for injunctive relief relating to CRW's alleged failure to implement an LTCP that complies with the requirements of the CSO Policy and the CWA, and does not resolve any claims for civil penalties relating to

CRW's alleged violations of the Clean Water Act or Clean Streams Law. This Consent Decree resolves the civil claims of the United States and PADEP against the City for the violations alleged in the Plaintiffs' Complaint through the Date of Lodging of this Consent Decree.

81. The United States and the PADEP reserve any and all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 80 [Resolution of Claims]. This Consent Decree shall not be construed to limit the rights of the United States or PADEP to obtain penalties or injunctive relief under the CWA or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 80 [Resolution of Claims]. The United States and PADEP further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Harrisburg Sewer System, whether related to the violations addressed in this Consent Decree or otherwise.

82. In any subsequent administrative or judicial proceeding initiated by the United States or PADEP for injunctive relief, civil penalties, or other appropriate relief relating to the Harrisburg Sewer System, Defendants shall not assert, and may not maintain, any defense or claim against Plaintiffs based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or PADEP in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 80 of this Section [Resolution of Claims].

83.     This Consent Decree does not limit or affect the rights of Parties against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

84.     This Consent Decree does not create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIV.   NOT A PERMIT

85.     This Consent Decree is not a permit and shall not be construed as a permit issued under any federal, state, or local laws or regulations, nor as a modification of any existing permit so issued.  This Consent Decree shall not in any way relieve Defendants of their obligations to obtain a permit for the AWTF, the Combined Sewer System, or any other part of the wastewater treatment and Sewer System or facilities or MS4, and to comply with the requirements of any NPDES permit or with any other applicable federal or state law or regulation.  Defendants shall comply with any new permit, or modification of existing permits in accordance with applicable federal, state, or local laws or regulations.

86.     The United States and PADEP do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, 33 U.S.C. §§ 1251-1387, or with any other provisions of federal, state, or local laws, regulations, or permits. Nothing herein shall be construed as relieving Defendants of the duty to comply with the CWA, the regulations promulgated under the CWA, and all applicable permits issued under the CWA and its regulations.

## XV.    INFORMATION COLLECTION AND RETENTION

87.    The United States and PADEP, and their representatives, contractors, consultants, and attorneys shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of proper credentials, for the purposes of:

a.    Monitoring the progress of activities required under this Consent Decree;

b.    Verifying any data or information submitted to the United States or PADEP in accordance the terms of to this Consent Decree;

c.    Obtaining samples and, upon request, splits of any samples taken by CRW or its representatives, contractors or consultants;

d.    Obtaining documentary evidence, including photographs and similar data;

e.    Inspecting and evaluating any portion or portions of the Harrisburg Sewer System;

f.    Inspecting and reviewing any records required to be kept under the terms and conditions of the Consent Decree, CRW's NPDES Permit, CRW's MS4 Individual Permit, any future modifications or renewals of the NPDES or MS4 Individual Permits, and the CWA; and

g.    Assessing Defendants' compliance with this Consent Decree.

88.    Upon request, CRW shall provide Plaintiffs or their authorized representatives, splits of any samples taken by CRW.  Upon request, Plaintiffs shall provide CRW splits of any sample taken by EPA or PADEP.

89.    Until five (5) years after the termination of this Consent Decree, CRW shall retain, and shall instruct its contractors and agents to preserve, the following documents and electronically stored data:

a.      All complaints received by CRW or its contractors or agents from any person or entity pertaining to the matters addressed by this Consent Decree;

b.      All documents required to be created, submitted, or maintained pursuant to the NMC Plan;

c.      All documents required to be created, submitted, or maintained pursuant to the requirements of the MCMs;

d.      Documentation of all measures undertaken by CRW to comply with the terms of this Consent Decree.

90.      CRW shall retain the following documents and electronically stored data until at least five (5) years after termination of this Consent Decree:

a.      All reports, plans, permits, and documents submitted to EPA or PADEP pursuant to this Consent Decree, including all underlying research and data; and

b.      All reports and data regarding water quality.

91.      The information-retention requirements in this Section XV (Information Collection and Retention) establish minimum retention periods that shall apply regardless of any contrary corporate or institutional policies or procedures, but do not excuse Defendants from any legal requirement to retain documents or data for longer periods of time.  At any time during this information-retention period, upon request by the United States or PADEP, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Section XV (Information Collection and Retention).

92.     At the conclusion of the information-retention period provided in Paragraphs 89 and 90, Defendants shall notify the United States and PADEP at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the Paragraphs 89 and 90 and, upon request by the United States or PADEP, Defendants shall deliver any such documents, records, or other information to the EPA or PADEP.  Defendants may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendants assert such a privilege, they shall provide the following:

  a.     The title of the document, record, or information;

  b.     The date of the document, record, or information;

  c.     The name and title of each author of the document, record, or information;

  d.     The name and title of each addressee and recipient;

  e.     A description of the subject of the document, record, or information; and

  f.     The privilege asserted by Defendants.

However, no final documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

93.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or PADEP pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

# XVI.   NOTICES AND SUBMISSIONS

94.     Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States Department of Justice:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
Re: DOJ No. 90-5-1-1-10157


As to US EPA:

Chief
NPDES Enforcement Branch (3WP42)
Water Protection Division
U.S. Environmental Protection Agency, Region 3
1650 Arch St.
Philadelphia, PA 19103-2029


Deane H. Bartlett
Senior Assistant Regional Counsel
Office of Regional Counsel (3RC20)
U.S. Environmental Protection Agency, Region 3
1650 Arch St.
Philadelphia, PA 19103-2029


As to PADEP:

Program Manager – Clean Water Program
Department of Environmental Protection
South Central Regional Office
909 Elmerton Avenue
Harrisburg, PA  17110-8200


As to CRW:

Chief Executive Officer
Capital Region Water
212 Locust Street
Harrisburg, PA  17101

Steven A. Hann
Hamburg, Rubin, Mullin, Maxwell & Lupin
375 Morris Road, P.O. Box 1479
Lansdale, PA  19446-0773


As to the City:

Mayor, City of Harrisburg
Mayor's Office, Suite 202
Reverend Dr. Martin Luther King City Government Center
10 North Second Street
Harrisburg, PA  17101

Neil Grover
City Solicitor, City of Harrisburg
Reverend Dr. Martin Luther King City Government Center
10 North Second Street
Harrisburg, PA  17101


95.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

96.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVII.  EFFECTIVE DATE

97.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court after satisfaction of the public notice and comment procedures of 28 C.F.R. § 50.7, or a Motion to Enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVIII. RETENTION OF JURISDICTION

98.     The Court shall retain jurisdiction over this case until termination of this Consent

Decree for all Defendants, for the purpose of resolving disputes arising under this Decree or

entering orders modifying this Decree, pursuant to Sections XII (Dispute Resolution) and XIX

(Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XIX.    MODIFICATION

99.     Except as otherwise expressly set forth in this Consent Decree, the terms of this

Consent Decree, including the attached appendices, may be modified only by a subsequent

written agreement signed by all Parties, excluding any Party for which, at the time of the

modification, the Consent Decree has already been terminated pursuant to Section XX

(Termination). Where the modification constitutes a material change to this Consent Decree, it

shall be effective only upon approval by the Court.

100.    Any disputes concerning modification of this Consent Decree shall be resolved

pursuant to Section XII (Dispute Resolution), provided, however, that, instead of the burden of

proof provided by Paragraph 78 [Standard of Review], the Party seeking the modification bears

the burden of demonstrating that it is entitled to the requested modification in accordance with

Federal Rule of Civil Procedure 60(b).

## XX.    TERMINATION

101.    After CRW has: (i) submitted the revised and updated LTCP to Plaintiffs for

review and approval pursuant to Paragraph 14, and the LTCP has been approved by Plaintiffs;

(ii) achieved compliance with all provisions contained in this Consent Decree and subsequently

have maintained compliance with each and every provision of this Consent Decree for twelve

(12) consecutive months; (iii) satisfactorily complied, as determined by Plaintiffs, with the

NPDES and MS4 Individual Permits for a period of twelve (12) consecutive months; (iv) paid

any accrued stipulated penalties as required by this Consent Decree, CRW may serve upon the United States and PADEP a Request for Termination, stating that CRW has satisfied those requirements, together with all necessary supporting documentation.

102.    After the City has: (i) paid any accrued stipulated penalties as required by this Consent Decree; and (ii) satisfactorily complied, as determined by Plaintiffs, with all other applicable requirements of this Consent Decree, the City may serve upon the United States and PADEP a Request for Termination, stating that the City has satisfied those requirements, together with all necessary supporting documentation.

103.    Following receipt by Plaintiffs of a Request for Termination, Plaintiffs and the Defendant requesting termination shall confer informally concerning the Request and any disagreement they may have as to whether the requesting Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with PADEP, agrees that the Consent Decree may be terminated as to the requesting Defendant, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree as to the requesting Defendant.  Termination of the Consent Decree as to the requesting Defendant shall not relieve the non-requesting Defendant of any obligations under this Consent Decree.

104.    If the United States, after consultation with PADEP, does not agree that the Consent Decree may be terminated as to the requesting Defendant, the Defendant requesting termination may invoke Dispute Resolution under Section XII (Dispute Resolution).  However, the Defendant requesting termination shall not seek Dispute Resolution under Paragraph 74 [Formal Dispute Resolution] of any dispute regarding termination until at least ninety (90) days after service of its Request for Termination.

## XXI.   PUBLIC PARTICIPATION

105.    This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold consent if the public comments regarding this Consent Decree disclose facts or considerations indicating that this Consent Decree is inappropriate, improper, or inadequate.  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States has notified Defendants in writing that it no longer supports entry of the Consent Decree.

## XXII.  SIGNATORIES/SERVICE

106.    Each undersigned representative of Defendants, PADEP, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

107.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Defendants hereby agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIII. COSTS OF SUIT

108.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and PADEP shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any stipulated penalties due but not paid by Defendants.

## XXIV. INTEGRATION/APPENDICES

109.     This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is the reporting form for the Semi-Annual Reports.

Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.

## XXV.  FINAL JUDGMENT

110.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, PADEP, and Defendants as to the claims resolved by this Consent Decree.  The Court finds that there is no just reason for delay and, therefore, enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.


SO ORDERED THIS _____ DAY OF _____, 2015


_____
UNITED STATES DISTRICT JUDGE
Middle District of Pennsylvania

The Undersigned Parties enter into this Consent Decree in the matter of *United States and Commonwealth of Pennsylvania Department of Environmental Protection v. City of Harrisburg; Capital Region Water* (M.D. Pa.) relating to alleged violations of the Clean Water Act.

FOR UNITED STATES OF AMERICA:

1/27/15
Date

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

1/28/2015
Date

MAYA S. ABELA
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 514-2717
Fax: (202) 616-6583
maya.abela@usdoj.gov

Of Counsel:

PETER J. SMITH
U.S. Attorney
Middle District of Pennsylvania

D. BRIAN SIMPSON
Assistant United States Attorney
Middle District of Pennsylvania
OH Bar # 71431
228 Walnut Street, Suite 220
Harrisburg, PA 17108-1754
Phone: (717) 221-4482
Fax: (717) 221-2246
D.Brian.Simpson@usdoj.gov

The Undersigned Parties enter into this Consent Decree in the matter of *United States and Commonwealth of Pennsylvania Department of Environmental Protection v. City of Harrisburg; Capital Region Water* (M.D. Pa.) relating to alleged violations of the Clean Water Act.

2/4/15

Date

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

2/2/15

Date

SUSAN SHINKMAN
Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

2-2-15

Date

MARK POLLINS
Director, Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

1/16/15

Date

JOANNA CITRON DAY
Attorney Advisor
Office of Civil Enforcement
U.S. Environmental Protection Agency

The Undersigned Parties enter into this Consent Decree in the matter of *United States and Commonwealth of Pennsylvania Department of Environmental Protection v. City of Harrisburg; Capital Region Water* (M.D. Pa.) relating to alleged violations of the Clean Water Act.

_2/2/15_
Date

SHAWN M. GARVIN
Regional Administrator
U.S. EPA Region III
1650 Arch Street
Philadelphia, PA 19103-2029

_January 29, 2015_
Date

MARY B. COE
Acting Regional Counsel
U.S. EPA Region III
1650 Arch Street
Philadelphia, PA 19103-2029

_January 8, 2015_
Date

DEANE H. BARTLETT
Senior Assistant Regional Counsel
Office of Regional Counsel
U.S. EPA Region III
1650 Arch Street
Philadelphia, PA 19103-2029

The Undersigned Parties enter into this Consent Decree in the matter of *United States and Commonwealth of Pennsylvania Department of Environmental Protection v. City of Harrisburg; Capital Region Water* (M.D. Pa.) relating to alleged violations of the Clean Water Act.

FOR THE COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF ENVIRONMENTAL PROTECTION:

1/14/15

Date

MARIA D. BEBENEK
Program Manager
Clean Water Program
Department of Environmental Protection
South Central Regional Office
909 Elmerton Avenue
Harrisburg, PA 17110-8200

1.14.15

Date

MARTIN H. SOKOLOW
Senior Counsel for Special Projects
Office of Chief Counsel
Department of Environmental Protection
South Central Regional Office
909 Elmerton Avenue
Harrisburg, PA 17110-8200
Phone: (717) 787-8790
Fax: (717) 772-2400
msokolow@pa.gov

The Undersigned Parties enter into this Consent Decree in the matter of *United States and Commonwealth of Pennsylvania Department of Environmental Protection v. City of Harrisburg; Capital Region Water* (M.D. Pa.) relating to alleged violations of the Clean Water Act.

FOR THE CITY OF HARRISBURG:

12/24/14
Date

ERIC PAPENFUSE
Mayor, City of Harrisburg
Mayor's Office, Suite 202
Reverend Dr. Martin Luther King City Government Center
10 North Second Street
Harrisburg, PA 17101

12/30/2014
Date

NEIL GROVER
City Solicitor, City of Harrisburg
Reverend Dr. Martin Luther King City Government Center
10 North Second Street
Harrisburg, PA 17101

12/24/14
Date

CHARLIE DEBRUNNER
City Controller, City of Harrisburg
Reverend Dr. Martin Luther King City Government Center
10 North Second Street
Harrisburg, PA 17101

The Undersigned Parties enter into this Consent Decree in the matter of *United States and Commonwealth of Pennsylvania Department of Environmental Protection v. City of Harrisburg; Capital Region Water* (M.D. Pa.) relating to alleged violations of the Clean Water Act.

FOR CAPITAL REGION WATER:

12/19/14
Date

SHANNON G. WILLIAMS
Chief Executive Officer
Capital Region Water
212 Locust Street
Harrisburg, PA 17101

12/18/2014
Date

STEVEN A. HANN
Hamburg, Rubin, Mullin, Maxwell & Lupin
375 Morris Road, P.O. Box 1479
Lansdale, PA 19446-0773

**APPENDIX A**

*United States of America and Commonwealth of Pennsylvania Department of Environmental Protection v. Capital Region Water and the City of Harrisburg, PA*

<u>**SEMI-ANNUAL REPORT**</u>

On a semi-annual basis on March 31 and September 30, for each Six-month Period commencing with the first full Six-month Period after entry of this Consent Decree and continuing until termination, CRW will submit to U.S. EPA and PADEP a progress report ("Semi-Annual Report") regarding the implementation of the requirements of this Decree in the previous Six-month Period. The Semi-Annual Report will include at a minimum:

a. A statement setting forth the deadlines and other terms that CRW is required by this Consent Decree to meet since the date of the last Semi-Annual Report, whether and to what extent CRW has met these requirements, the reasons for any noncompliance, and steps that are being taken to get back on schedule;

b. A general description of the work completed within the Six-month Period, and a projection of work to be performed pursuant to this Consent Decree during the next or succeeding Six-month Period. This description of work completed should include Nine Minimum Controls and Minimum Control Measures activity during the past Six-month Period. Notification to U.S. EPA and PADEP of any anticipated delay shall not, by itself, excuse the delay;

c. A statement of any exceedances of NPDES Permit;

d. A summary of all Sanitary Sewer Overflows (SSOs) and other unpermitted discharges occurring within the Six-month Period including the actual or estimated frequency, duration, and volume of each SSO; and

e. A summary of all Combined Sewer Overflows (CSOs) within the Six-month Period including the following information:

   1. Type of overflow (wet or dry);
   2. Outfall number;
   3. Date of overflow;
   4. Detailed description of cause of overflow;
   5. Estimated amount and duration of rainfall, if applicable;
   6. Estimated duration of overflow;
   7. Total volume (gallons) of overflow;
   8. Date and estimated time the discharge started;
   9. Date and estimated time the discharge ended;
   10. Any corrective action taken; and
   11. Initial of the inspector.

f. Information regarding each instance of Secondary Bypass at the Advanced Wastewater Treatment Facility ("AWTF"), including:
   1. Date of each bypass;
   2. Amount of rainfall;
   3. If not wet weather related, cause of bypass;
   4. Estimated duration of bypass;
   5. Total volume (gallons) of bypass;
   6. Minimum, maximum and average flow through complete treatment during bypass;
   7. Date and estimated time the bypass started;
   8. Date and estimated time the bypass ended.

g. Any updated Gantt charts or equivalent long-term planning documents.